UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ELIAS WEXLER, ZERO INTERNATIONAL
REALTY CO., INC., ZERO OHIO, LLC, ZERO
AMERICA LATINA, LTD., ZERO ASIA PACIFIC
LTD., and ZERO EAST, LTD.,

Plaintiffs,

- against -

ALLEGION (UK) LIMITED and SCHLAGE LOCK
COMPANY, LLC,

Defendants.

**OPINION AND ORDER**

16 Civ. 2252 (ER)

---

Ramos, D.J.:

Elias Wexler ("Wexler"), Zero International Realty Co., Inc. ("Zero Realty"), Zero Ohio,

LLC ("Zero Ohio"), Zero America Latina, Ltd. ("Zero Latina"), Zero Asia Pacific Ltd. ("Zero

Asia"), and Zero East, Ltd. ("Zero East," and collectively, "Plaintiffs") brought this action

against Allegion (UK) Limited ("Allegion UK") and Schlage Lock Company, LLC ("Schlage,"

and collectively, "Defendants"), alleging a host of state law claims.  Now pending before the

Court is Defendants' motion to dismiss Counts I, II, III, VII, and VIII of the Complaint.  For the

reasons discussed below, Defendants' motion is GRANTED in part and DENIED in part.

Plaintiffs will be given an opportunity to replead.

## I.  BACKGROUND[1]

Wexler is an entrepreneur and engineer who, for thirty-five years, served as the President

and CEO of Zero International, Inc. ("Zero International"), a Bronx company known for

---

[1] The following facts are drawn from the Complaint and are assumed true for the purposes of deciding Defendants'
motion.

creative, effective, and affordable approaches to construction material needs in the acoustical, fireproofing, and door-hardware fields.  Compl. (Doc. 2, Ex. A) ¶ 28.  Under Wexler's leadership, Zero International expanded its operations from one small factory in the Bronx to an international company, with four factories in the United States, branches all over the country, and sales in thirty-five countries around the world.  *Id.* ¶ 31.  Wexler is also the sole shareholder and President of Zero Realty, the majority member and President of Zero Ohio, and the 51% shareholder and President of each of Zero Latina, Zero Asia, and Zero East.  *Id.* ¶¶ 9–13.

Wexler has been published in many trade magazines and has served as a visiting lecturer at the Pratt Institute of Design, President of the New York Society of Manufacturing Engineers, and President of the New York Critical Manufacturing Sector Coordinating Council.  *Id.* ¶¶ 35–38.  He was a member of the Builders Hardware Manufacturers Association, which advises and writes standards for the American National Standards Institute.  *Id.* ¶ 39.

In 2014, Defendants expressed an interest in acquiring Zero International.  *Id.* ¶ 42.  At all relevant times, Wexler's primary contact for Defendants was Anshu Mehrotra ("Mehrotra"), Allegion's Vice President and General Manager of Commercial Mechanical Business.  *Id.* ¶ 43.  In connection with Defendants' acquisition of Zero International, Wexler and Mehrotra discussed Wexler's desire and expectation to continue working in the industry.  *Id.* ¶ 45.  The two agreed that Wexler would continue to use his extensive expertise to further Defendants' business interests.  *Id.*  Specifically, Mehrotra told Wexler that Defendants would continue to employ him after the acquisition for a minimum of eighteen months and that Wexler would be permitted to retain the title of "'President Emeritus' of Zero International for life."  *Id.* ¶ 48.

Wexler and Mehrotra also discussed Wexler's desire that, following the acquisition, Defendants continue to use Zero Latina, Zero Asia, and Zero East as Zero International's

exclusive distributors.  *Id.* ¶ 46.  Mehrotra, on behalf of Defendants, agreed that with regard to these three companies, "nothing would change," and that they would continue to be the exclusive distributors in their respective geographic regions for products manufactured and sold by Zero International.  *Id.* ¶ 47.

On or about February 13, 2015, Mehrotra sent Wexler a formal offer of employment upon the closing of Defendants' acquisition of Zero International.  *Id.* ¶ 49.  Wexler was offered to join Defendants as "President Emeritus – Zero Group International" with a base annual salary of $190,000 plus benefits and other financial incentives.  *Id.* ¶ 50.  Wexler's job responsibilities were to include:  sharing his knowledge of the industry and of Zero International's products and applications with Defendants' team at business meetings and presentations, helping Steelcraft (a company owned by Allegion) comply with acoustical standards, continuing his efforts to include Intumescent (a product produced by Zero International) in the Builders Hardware Manufacturers Association's standards and the National Fire Protection Association's certifications, providing support at Zero International's Bronx facilities on an as-needed and as-requested basis, and engaging and building relationships with international customers.  *Id.* ¶ 52.  The offer contained the following provision:

> If Allegion involuntarily terminates your employments [*sic*] without cause prior to August 31, 2016, Allegion will pay you a lump sum equal to the total amount of base salary that would have been paid to you through August 31, 2016 if you had remained employed by Allegion through that date reduced by any amounts of base salary paid to you prior to such date.  This lump sum payment shall be made as soon as administratively practicable after your termination of employment date and in no event later than the end of the month following the month in which your employment terminates.

*Id.* ¶ 51.  On February 19, 2015, Defendants acquired Zero International pursuant to an Asset Purchase Agreement ("APA") executed by Defendants, Wexler, and certain other parties.  *Id.* ¶ 44.

Wexler worked for Defendants from approximately April 1, 2015 through September 17, 2015. *Id.* ¶ 53.  As part of his duties and at Defendants' request, Wexler attended meetings in New York, throughout the country, and around the world. *Id.* ¶ 54.  Wexler also met regularly with Defendants' employees to discuss Zero International's business and products. *Id.* ¶ 57. During the term of his employment, neither Mehrotra nor anyone else on behalf of Defendants ever complained to Wexler about his work performance, and Defendants never reprimanded or disciplined Wexler in any way connected with his work. *Id.* ¶¶ 59–68.

On or about September 17, 2015, Mehrotra traveled to Wexler's office in the Bronx, accompanied by the head of human resources and two security guards. *Id.* ¶ 69.  Mehrotra abruptly told Wexler that "we're separating" and that he had thirty minutes to pack up his personal belongings and leave the building. *Id.* ¶ 70.  Wexler was humiliated, and he silently collected his belongings. *Id.* ¶ 72.  After meeting briefly with a representative of Defendants' human resources department, Wexler was expelled from the building by two security guards, in plain sight of his coworkers and colleagues, who stared at him. *Id.* ¶¶ 72–74.  Wexler alleges that the spectacle gave those who viewed it the false impression that Wexler had engaged in misconduct and was being terminated for cause. *Id.* ¶ 75.  Later, Wexler discovered that Defendants had also terminated his wife and son—whom Defendants had also employed after acquiring Zero International—in a similarly "public and humiliating" fashion. *Id.* ¶ 79.  Wexler was 65 years old at the time he was fired. *Id.* ¶ 80.

On or about September 17, 2015, Defendants sent Wexler a letter concerning his termination. *Id.* ¶ 81.  The letter advised Wexler that he had been terminated as part of a "reduction in force." *Id.*  However, Wexler alleges that he was actually terminated because of his age and his "old-school" business practices. *Id.* ¶ 2.  In the letter, Defendants agreed to pay

Wexler the approximately $175,000 to which he was entitled, pursuant to his offer letter, because he had been terminated without cause, but only if Wexler first agreed to sign a ten-page contract that included a general release and other conditions affecting his rights. *Id.* ¶ 81. Wexler refused to sign the contract, and Defendants, in turn, did not pay Wexler the $175,000. *Id.* ¶ 82.

Wexler alleges that Defendants falsely informed prominent members of the acoustical, fireproofing, and door-hardware industries that Wexler's work for Defendants had been unsatisfactory and that Wexler was unworthy of continued employment. *Id.* ¶ 83. Wexler also alleges that Defendants informed these industry leaders about the manner of his termination, and that these individuals interpreted Defendants' conduct as conveying the fact that Wexler had engaged in misconduct, was being terminated for cause, and was incompetent, dishonest, and unworthy of employment. *Id.* ¶¶ 83–85. Wexler asserts that Defendants' conduct damaged his reputation, destroyed his future career prospects, and rendered meaningless the title of "President Emeritus." *Id.* ¶¶ 86–87. Since being terminated, Wexler has been stripped of his membership on the board of the New York Critical Manufacturing Sector Coordinating Counsel, and can no longer attend meetings and events for the Builders Hardware Manufacturers Association. *Id.* ¶¶ 90–91. Defendants also refused to use Zero Latina, Zero Asia, and Zero East as their exclusive suppliers and distributors for Zero International products. *Id.* ¶ 95.

On February 29, 2016, Plaintiffs brought this action against Defendants in New York State Supreme Court, Bronx County, alleging age discrimination in violation of the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"); defamation; breach of various contracts, including Wexler's employment contract and the oral distributor contracts with Zero Latina, Zero Asia, and Zero East; unjust enrichment; and conversion. *Id.* ¶¶ 125–183. Plaintiffs seek damages in excess of $10 million, as well as

certain declaratory and injunctive relief.  *Id.* at 26–27.  On March 28, 2016, Defendants removed the case to this Court on the basis of diversity jurisdiction.  Doc. 2.  On November 9, 2016, the Court denied Plaintiffs' motion to remand the case back to state court.  Doc. 36.

Now pending before the Court is Defendants' motion to dismiss Plaintiffs' claims for age discrimination (Counts I and II); defamation (Count III); breach of the distributor contracts with Zero Latina, Zero Asia, and Zero East (Count VII), and conversion (Count VIII).[2]  After Defendants filed their motion, Plaintiffs voluntarily dismissed their claim for conversion.  Doc. 44.  Plaintiffs otherwise oppose Defendants' motion.

## II.  LEGAL STANDARD

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S.

---

[2] Defendants have not moved to dismiss Plaintiffs' claims for breach of Wexler's employment contract (Count IV); breach of Zero Realty's cleaning and maintenance services contract (Count V); unjust enrichment (Count VI); and breach of Zero Ohio's lease (Count IX).

at 556).  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

## III.  DISCUSSION

### A.  Age Discrimination

Defendants first seek dismissal of Wexler's claims for age discrimination.  In order to establish a *prima facie* case of age discrimination in violation of NYSHRL or NYCHRL, a plaintiff must show that (1) he was within the protected age group; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of age discrimination.  *Stephenson v. Hotel Emps. & Rest. Emps. Union Local 100 of the AFL-CIO*, 6 N.Y.3d 265, 270 (2006); *see also Krebaum v. Capital One, N.A.*, 138 A.D.3d 528, 528 (1st Dep't 2016); *Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 112–14 (1st Dep't 2012).[3]  At the pleading stage, however, a plaintiff need not plead facts giving plausible support to the "ultimate question" of whether an adverse action was attributable to discrimination; rather, the facts need only give plausible support to a "minimal inference" of discriminatory motivation.  *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).  The Second Circuit has clarified that "the inference of discriminatory intent supported by the pleaded facts [need not] be *the most plausible* explanation of the defendant's conduct.  It is sufficient if the inference of discriminatory intent is plausible."  *Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2d Cir. 2016) (emphasis in original); *see also Dawson v. N.Y.C. Transit Auth.*, 624 F. App'x 763, 770 (2d Cir. 2015) (summary order)

---

[3] Once a plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.  *Stephenson*, 6 N.Y.3d at 270–71.  After the defendant has done so, the burden shifts back to the plaintiff to demonstrate that the articulated reason is pretextual.  *Id.* at 271.

("At the pleading stage, district courts would do well to remember this exceedingly low burden that discrimination plaintiffs face . . . .").

Notwithstanding his exceedingly low burden, the Court finds that Wexler has not sufficiently alleged an age discrimination claim.  Wexler's claim is supported by a single factual allegation—that he "was 65 years old when Defendants terminated him."  Compl. ¶ 80.  That fact alone is plainly insufficient to give rise to a minimal plausible inference of age discrimination.  *See, e.g.*, *Castagna v. Luceno*, No. 09 Civ. 9332 (CS), 2011 WL 1584593, at *11 (S.D.N.Y. Apr. 26, 2011) (dismissing age discrimination claim where plaintiff's only allegation "even potentially related to the age discrimination claim [was] that [plaintiff] 'was born in 1949,'" as "[s]uch an allegation cannot possibly support a claim for age discrimination").

Wexler also alleges that Defendants "terminated him . . . because of his age and his 'old-school' business practices."  Compl. ¶ 2.  Because Wexler does not attribute the phrase, "old-school," to any particular speaker, however, his allegation is entirely conclusory.  "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Wexler asserts that he unintentionally omitted to attach the phrase, "old-school," to a speaker, and states that he can supplement his allegations to include "the circumstances surrounding Defendants' unlawful ageist remarks to him" and "actions that were taken against him but none of his younger colleagues during the brief time that he was employed by Defendants."  Pl.'s Opp'n Mem. (Doc. 42) at 15.  Because Wexler may be able to supplement his allegations to raise a plausible inference that his termination was due to age discrimination, Wexler will have an opportunity to replead these claims.

### B.  Defamation

Defendants next seek dismissal of Wexler's defamation claim.  Wexler claims that Defendants defamed him in two respects.  First, Wexler alleges that the manner in which he was terminated—*i.e.*, escorted by two security guards through and out of the building—gave those who viewed the spectacle, as well as industry leaders in the acoustical, fireproofing, and door-hardware fields who learned about it, the false impression that he had engaged in misconduct and was being terminated for cause.  Compl. ¶¶ 75–76, 84–85.  Second, Wexler alleges that, in addition to informing them about the manner of his termination, Defendants falsely informed industry leaders that his work had been unsatisfactory and that he was unworthy of continued employment.  *Id.* ¶ 83.

#### 1.  Manner of Termination

Defendants first argue that the way in which they terminated Wexler cannot serve as the basis of a defamation claim, because non-verbal conduct cannot constitute a defamatory statement as a matter of New York law.  Defs.' Mem. (Doc. 19) at 10–13; Defs.' Reply Mem. (Doc. 45) at 3–5 & n.2.  Defendants are correct.  In order to state a claim for defamation in New York, a plaintiff must first and foremost "identify[] the allegedly defamatory *words* that were uttered."  *Ello v. Singh*, 531 F. Supp. 2d 552, 580 (S.D.N.Y. 2007) (emphasis added); *see also Contes v. City of New York*, No. 99 Civ. 1597 (SAS), 1999 WL 500140, at *9 (S.D.N.Y. July 14, 1999) (dismissing defamation claim based on defendant's conduct in suspending plaintiff because "slander requires the making of an oral or written defamatory statement"); *Bourquin v. Brink's Inc.*, No. 97 Civ. 7522 (LBS), 1999 WL 108766, at *4 (S.D.N.Y. Mar. 3, 1999) (dismissing defamation claim based on defendant's conduct because "New York courts do not allow recovery for defamatory conduct").  The cases to which Wexler cites in support of his

argument are all inapposite, as none of them apply New York law.  *See* Pl.'s Opp'n Mem. at 16–

19; *see also* Dave Kluft, Note, *Beyond Words: The Potential Expansion of Defamation by*

*Conduct in Massachusetts*, 83 B.U. L. Rev. 619, 629, 639 n.167 (2003) (noting that "New York

is particularly conservative in the area of defamation by conduct," being one of the few states

that "explicitly rejects" the theory).  Wexler may not, therefore, proceed on a defamation claim

based on the manner of his termination.

### 2.  Statements to Industry Leaders

Defendants deny making the alleged statements to industry leaders about Wexler, but

they nonetheless argue that those statements cannot serve as the basis of a defamation claim,

since they are non-actionable opinions.  Defs.' Mem. at 13, 15–17.  Under New York law,

expressions of pure opinion, as opposed to statements of fact, are not actionable and receive full

constitutional protection.  *Davis v. Boeheim*, 24 N.Y.3d 262, 268–69 (2014).  "[W]hether a

statement is opinion or rhetorical hyperbole as opposed to a factual representation is a question

of law for the court."  *Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir. 1985);

*see also Levin v. McPhee*, 119 F.3d 189, 196 (2d Cir. 1997) (same).  The following three factors

are generally considered by New York courts to determine whether a statement is actionable fact

or non-actionable opinion:

> (1) whether the specific language in issue has a precise meaning
> which is readily understood; (2) whether the statements are capable
> of being proven true or false; and (3) whether either the full context
> of the communication in which the statement appears or the broader
> social context and surrounding circumstances are such as to
> signal . . . readers or listeners that what is being read or heard is
> likely to be opinion, not fact.

*Davis v. Boeheim*, 24 N.Y.3d at 270.  The third factor "requires that the court consider the

content of the communication as a whole, its tone and apparent purpose."  *Id.*; *see also Levin*,

119 F.3d at 197 ("Instead of parsing out and evaluating the challenged statements in isolation,

New York courts look to the immediate context and the broader social context of the statement and evaluate the impact that the statements would have on a reasonable reader.") (citations omitted).  At bottom, the inquiry is whether a reasonable listener would have understood the challenged statements to be conveying facts about the plaintiff.  *Davis v. Boeheim*, 24 N.Y.3d at 270.

Defendants characterize their alleged statements to industry leaders as those of an employer regarding an employee's work performance, which are typically found to be statements of opinion under New York law.  Defs.' Mem. at 16–17; *see, e.g.*, *Protic v. Dengler*, 46 F. Supp. 2d 277, 280–81 (S.D.N.Y. 1999) (defendant's comments to other prospective employers that plaintiff's work performance was "unsatisfactory" and that plaintiff was "not competent" were "clearly" statements of opinion), *aff'd*, 205 F.3d 1324 (2d Cir. 1999); *Varughese v. Mt. Sinai Med. Ctr.*, 12 Civ. 8812 (CM), 2015 WL 1499618, at *74 (S.D.N.Y. 2015) (defendant's characterizations of plaintiff's work as "unsatisfactory," "unprofessional," and "substandard" were matters of opinion, not actionable assertions of fact); *Doe v. White Plains Hosp. Med. Ctr.*, No. 10 Civ. 5405 (GBD), 2011 WL 2899174, at *3 (S.D.N.Y. July 8, 2011) ("New York courts have consistently held that subjective job evaluations, including those in connection with an employee's termination, are non-actionable opinion."), *aff'd sub nom. Doe v. French*, 458 F. App'x 21 (2d Cir. 2012) (summary order).

Even when the alleged defamatory statement was made by an employer about his employee, however, the Court must still consider the context of the communication to determine whether it constitutes opinion or fact.  *See, e.g.*, *Davis v. Ross*, 754 F.2d 80, 86 (2d Cir. 1985) (finding that a letter written and disseminated by the plaintiff's former employer, when read in

context, could not be construed as a "mere expression of her opinion").[4]  Here, the context of

Defendants' statements are not entirely clear from the allegations in the Complaint.  Wexler does

not indicate whether he attempted to seek employment with the industry leaders Defendants

allegedly spoke with or whether those individuals contacted Defendants to inquire about his

performance as an employee.  Moreover, according to Wexler, Defendants did not merely

provide those individuals with an evaluation of his work performance—they also communicated

the fact that he had been escorted by two security guards through and out of the building upon

his termination.  Compl. ¶ 83.  Based on the current record, the Court cannot say as a matter of

law whether a reasonable listener would have understood Defendants' statements to be

conveying opinions or facts.

Regardless of whether Defendants' comments to industry leaders are deemed to be

statements of opinion or assertions of fact, however, they may be actionable, and dismissal at this

stage is thus improper.  First, Defendants' statements to industry leaders could be actionable as

assertions of fact.  To state a claim for defamation under New York law, a plaintiff must allege

(1) a false statement about him, (2) published without privilege or authorization to a third party,

(3) through fault as judged by at minimum a negligence standard, (4) that either causes him

special harm or constitutes defamation per se.  *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d

---

[4] In *Davis v. Ross*, the plaintiff alleged that at all times before she voluntarily resigned, she performed her services for the defendant in a professional and competent manner.  754 F.2d at 81.  The plaintiff never attempted to use the defendant as a reference for new employment, nor had anyone solicited information from the defendant regarding the plaintiff's professional competence.  *Id.* at 82.  However, one year after the plaintiff's resignation, the defendant disseminated a letter stating that the plaintiff was no longer in her employment, adding:  "If I let an employee go, it's because either their work or their personal habits are not acceptable to me.  I do not recommend these people.  In fact, if you hear from these people, and they use my name as a reference, I wish to be contacted."  *Id.* at 81–82.  The court noted that if the defendant's letter were mere opinion, she would have had no reason to send it to persons who never solicited any information regarding the plaintiff.  *Id.* at 86.  Moreover, the court explained, "even if the first part of the letter merely expresses [defendant's] opinion, the subsequent statement, 'I do not recommend these people,' tends to objectify the evaluation and implies that others would also find [plaintiff's] work or personal habits unacceptable."  *Id.*

164, 169 (2d Cir. 2003) (quoting *Dillon v. City of New York*, 261 A.D.2d 34, 38 (1st Dep't 1999)).  Wexler sufficiently alleges all four elements, as he pleads that (1) Defendants' statements that his work was "unsatisfactory" and that he was "unworthy of continued employment" were false, (2) Defendants made these statements to third-party industry leaders, (3) Defendants had never complained about Wexler's work performance before and sent him a letter stating that he had been terminated as part of a "reduction in force," and (4) the statements injured his business reputation and future career prospects.[5]

Alternatively, Defendants' statements to industry leaders could be actionable as opinions. A statement of opinion which implies that it is based on facts that support the opinion, which are unknown to persons reading or hearing it, is an actionable "mixed opinion."  *Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014); *Davis v. Boeheim*, 24 N.Y.3d at 269.  Assuming as true the allegation that Defendants also communicated to industry leaders the manner of Wexler's termination, a reasonable listener could conclude that Defendants' assessment of Wexler as an employee was based on undisclosed defamatory facts about Wexler, such as misconduct or dishonesty.

Furthermore, opinions based on false facts are actionable against a defendant who had knowledge of the falsity or probable falsity of the underlying facts.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 114 (2d Cir. 2010) (quoting *Davis v. Ross*, 754 F.2d at 86).  Wexler alleges

---

[5] Because Wexler will be permitted to proceed with his defamation claim, the Court need not decide at this stage whether Wexler may also be able to sustain a "defamation by implication" claim based on Defendants' communication to industry leaders of the true fact that Wexler was escorted from the building by security guards upon his termination.  *See Herbert v. Lando*, 781 F.2d 298, 307 (2d Cir. 1986) (providing that a defamatory implication might be actionable where "a combination of individual statements which in themselves may not be defamatory might lead the reader to draw an inference that is damaging to the plaintiff"); *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 37–38 (1st Dep't 2014) ("To survive a motion to dismiss a claim for defamation by implication where the factual statements at issue are substantially true, the plaintiff must make a rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference.").

that he performed his job duties satisfactorily and that Defendants never complained about his work performance.  Compl. ¶¶ 58–68.  Moreover, Wexler alleges that Defendants sent him a letter acknowledging that he had been fired without cause as part of a "reduction in force."  *Id.* ¶ 81.  Because Defendants' alleged statements that Wexler's work had been "unsatisfactory" and that Wexler was "unworthy of continued employment" may be found to be based on false facts within Defendants' knowledge, the statements may be actionable even if they were merely expressions of opinion.

Finally, Defendants argue that Wexler fails to plead sufficient factual details supporting his defamation claim, including facts that identify the purported statement and indicate who made the statement, when it was made, and to whom it was made.  Defs.' Mem. at 13–15; *see Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 329 (S.D.N.Y. 2010).  Wexler has identified the substance of the statements, however, and has indicated in a general fashion who made them (individuals working for Defendants), when they were made (following Wexler's termination in September 2015), and to whom they were made (industry leaders).  The Court finds that Wexler has thus sufficiently given Defendants notice of the communications complained of to enable them to defend themselves.  *See Ello*, 531 F. Supp. 2d at 575–76 ("While the defamation need not be plead *in haec verba*, a pleading is only sufficient if it adequately identifies the purported communication, and an indication of who made the statement, when it was made, and to whom it was communicated.  The central concern is that the complaint afford defendant sufficient notice of the communications complained of to enable him to defend himself.") (citations and internal quotation marks omitted).

### C.  Breach of the Distributor Contracts

Defendants also seek dismissal of Plaintiffs' breach of contract claim with respect to the alleged distributor contract that Defendants entered into with Zero Latina, Zero Asia, and Zero East, in part on the basis that Plaintiffs have failed to sufficiently allege such a claim.  In order to assert a claim for breach of contract in New York, a party must adequately plead (1) the existence of a contract, (2) its own adequate performance of the contract, (3) breach by the other party, and (4) damages suffered as a result of the breach.  *See, e.g.*, *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998).

Here, Plaintiffs allege that "[i]n tandem with Defendants' acquisition of Zero International," Wexler and Mehrotra "discussed the status of Zero Latina, Zero Asia and Zero East as Zero International's exclusive distributors."  Compl. ¶¶ 45–46.  According to Plaintiffs, "Wexler specifically told Mehrotra that, after Defendants' anticipated acquisition of Zero International, he wanted Defendants to continue using these overseas companies as Zero International's exclusive distributors in their respective geographic regions," and that "Mehrotra, on behalf of Defendants, agreed that with regard to Zero Latina, Zero Asia and Zero East, 'nothing would change,'" meaning "they would continue to be the exclusive distributors (in their respective geographic regions) for products manufactured and sold by Zero International."  *Id.* ¶¶ 46–47.  Plaintiffs allege that Defendants breached their contractual obligation by refusing to use Zero Latina, Zero Asia and Zero East as their exclusive suppliers and distributors for Zero International products, and instead selling Zero International products on their own in these markets.  *Id.* ¶ 95.  As a result of Defendants' breach, Plaintiffs allege that Zero Latina has suffered $100,000 in damages annually, Zero Asia has suffered $500,000 in damages annually, and Zero East has suffered $500,000 in damages annually.  *Id.* ¶¶ 96–98.

Plaintiffs have not alleged that Zero Latina, Zero Asia, and Zero East adequately performed under the alleged distributor contract.  As Plaintiffs' own adequate performance of the contract is a required element under New York law, this omission alone warrants dismissal of Plaintiffs' claim.  Because Plaintiffs allege that they may be able to supplement their allegations to demonstrate their own compliance, Pls.' Opp'n Mem. at 25, they will have an opportunity to replead this claim.[6]

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Wexler is permitted to proceed on his defamation claim and is granted leave to replead his age discrimination claims.  Zero Latina, Zero Asia, and Zero East are granted leave to replead their breach of distributor contract claim.  As Plaintiffs voluntarily dismissed their conversion claim, Defendants' motion to dismiss that claim is denied as moot.  Plaintiffs' Amended Complaint must be filed, if at all, on or before **March 30, 2017**.  Defendants' response is due **April 20, 2017**.  The parties are directed to appear for a conference on **April 21, 2017 at 10:30 a.m.**  The Clerk of the Court is respectfully directed to terminate the motion, Doc. 18.

It is SO ORDERED.

Dated:   March 9, 2017
         New York, New York

Edgardo Ramos, U.S.D.J.

---

[6] The Court need not weigh in on Defendants' alternative arguments in favor of dismissal of the distributor contract claim, namely that Plaintiffs have not alleged any of the essential terms of the alleged distributor contract and that the contract is unenforceable under New York's Uniform Commercial Code, New York's Statute of Frauds, and/or the APA.  *See* Defs.' Mem. at 18–27.  Now that Plaintiffs have had an opportunity to preview Defendants' arguments, however, it would behoove them to supplement their allegations in more than just one respect.