UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELIAS WEXLER, ZERO INTERNATIONAL
REALTY CO., INC., ZERO OHIO, LLC, ZERO
AMERICA LATINA, LTD., ZERO ASIA PACIFIC
LTD., ZERO EAST, LTD., 391 CONCORD AVENUE,
INC., and ZERO REALTY NC LLC,

                             Plaintiffs,

                - against -

ALLEGION (UK) LIMITED, SCHLAGE LOCK
COMPANY, LLC, and ALLEGION PLC,

                           Defendants.

**OPINION AND ORDER**

16 Civ. 2252 (ER)

Ramos, D.J.:

       Elias Wexler ("Wexler"), Zero International Realty Co., Inc. ("Zero Realty"), Zero Ohio,

LLC ("Zero Ohio"), Zero America Latina, Ltd. ("Zero Latina"), Zero Asia Pacific Ltd. ("Zero

Asia"), and Zero East, Ltd. ("Zero East") brought this action against Allegion (UK) Limited

("Allegion UK") and Schlage Lock Company, LLC ("Schlage"), alleging a host of state law

claims. On March 9, 2017, the Court granted in part and denied in part Defendants' motion to

dismiss, permitting Wexler to proceed on his defamation claim and granting him leave to replead

his age discrimination claims, and granting Zero Latina, Zero Asia, and Zero East leave to

replead their breach of contract claims. *See* Opinion and Order on Defendants' Motion to

Dismiss (the "March 2017 Order") (Doc. 46). Plaintiffs filed an amended complaint on April 28,

2017, naming Zero Realty NC, LLC ("Zero NC") and 391 Concord Avenue, Inc. ("Concord") as

additional plaintiffs, naming Allegion plc as an additional defendant, adding multiple new

claims, and dropping Wexler's prior age discrimination and breach of employment contract

claims. *See* Plaintiffs' Amended Complaint ("Am. Comp.") (Doc. 52). Pending before the

Court are:  (1) Defendants' motion to dismiss Counts One, Two, Four through Twelve, and Eighteen of the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and (2) Allegion plc's motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).  For the reasons discussed below, Defendants' 12(b)(6) motion is GRANTED in part and DENIED in part, and Allegion plc's 12(b)(2) motion is GRANTED.

## I.      Factual Background[1]

Wexler is an entrepreneur and engineer who, for thirty-five years, served as the President and CEO of Zero International, Inc. ("Zero International"), a Bronx company specializing in the manufacture and wholesale of door and window fixtures, frames, weather-stripping, and acoustic and fire-proof liners and seals.  Am. Compl. ¶¶ 31–32, 35.  The company earned the reputation as the "gold standard" for high-quality door and window seals and fixtures, having developed its own patented designs, created its own specialized factory machinery, and devoted significant resources to obtain high quality materials and train factory workers.  *Id*. ¶ 32.  Under Wexler's leadership, Zero International expanded its operations from one small factory in the Bronx to an international company with four factories in the United States (including in Ohio and North Carolina), branches all over the country, and sales in thirty-five countries around the world.  *Id.* ¶ 35.  Throughout that expansion, Wexler was committed to the Bronx community where the company was founded, maintaining Zero International's headquarters and main factory in the Bronx and employing numerous local workers.  *Id*.

Wexler has been published in trade magazines and has served as a visiting lecturer at the Pratt Institute of Design, President of the New York Society of Manufacturing Engineers, and

---

[1] The following facts are drawn from the Amended Complaint and are assumed true for the purposes of deciding Defendants' motion.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

President of the New York Critical Manufacturing Sector Coordinating Council.  *Id.* ¶¶ 37–38.

He was a member of the Builders Hardware Manufacturers Association, which advises and

writes standards for the American National Standards Institute.  *Id.* ¶ 37.  Wexler is also the sole

shareholder and President of Zero Realty and Concord, the majority member and President of

Zero Ohio and Zero Realty NC, and the 51% shareholder and President of each of Zero Latina,

Zero Asia, and Zero East.  *Id.* ¶¶ 9–13.

    In 2014, Allegion UK and Allegion plc[2] (collectively, "Allegion") and Schlage

approached Wexler and expressed interest in acquiring Zero International through an asset

purchase transaction.  *Id.* ¶ 40.  Until then, Wexler had not seriously considered selling the

company.  *Id.*  Wexler alleges that Anshu Mehrotra ("Mehrotra"), Allegion's Vice President and

General Manager of Commercial Mechanical Business, nonetheless enticed him with collateral

benefits of the deal for Wexler personally, beyond the economic benefits such a transaction

would bring him as the principal shareholder of Zero International.  *Id.* ¶ 41.  For example,

Wexler and Mehrotra discussed Wexler's desire to continue his leading statesman role in the

industry so that he could continue his teaching positions, speaking engagements, and

membership in various industry organizations.  *Id*. ¶ 44.  Mehrotra, on behalf of Allegion and

Schlage, assured Wexler that they would support and promote Wexler in an "emeritus" role so

that he could continue his high-profile involvement in the industry, which would also benefit

Allegion.  *Id*. ¶¶ 43–44.  Mehrotra also represented that Allegion would offer Wexler an

honorary "lifetime" position on an internal board of directors for Allegion's U.S. commercial

mechanical division so long as Allegion sold Zero products.  *Id*. ¶ 43.

---

[2] Allegion plc, incorporated and headquartered in Ireland, is the parent of Allegion UK.  Am. Compl. ¶ 23.

In their discussions, Wexler also made it clear to Allegion and Mehrotra that the success of Zero International was his greatest career achievement and that his main priority was to ensure that the company continued beyond his lifetime as a leading company in the industry. *Id*. ¶ 45. Mehrotra told Wexler that this was consistent with Allegion and Schlage's interests and intent in acquiring the Zero brand and product line, and assured him that Defendants would maintain the high quality of Zero products. *Id*. ¶¶ 45, 71. Moreover, he represented that Defendants intended to keep Zero International's workforce in the Bronx, Ohio, and North Carolina. *Id*. ¶ 71.

Based on Mehrotra's assurances, Wexler agreed to negotiate an asset purchase agreement ("APA"). *Id*. ¶ 46. According to the Amended Complaint, Wexler was so pleased with Mehrotra and Allegion's representations that he engaged in minimal negotiation over the purchase price. *Id*. Following further negotiations on the structure and terms of the agreement, Wexler and Defendants entered into the APA, which governed the sale of substantially all of Zero International's assets to Defendants. *Id*. ¶ 48. The parties executed the APA on February 19, 2015, and the transaction closed on April 1, 2015. *Id*. Pursuant to the APA, Defendants paid Wexler a fixed cash purchase price in exchange for acquiring Zero International's name, brand, product line, inventory, designs, patents and other intellectual property, and its factory machinery. *Id*. ¶ 49. The APA contemplated that Defendants would continue to manufacture and sell Zero products through a Schlage subsidiary, known as Zero Group International ("New Zero"), wholly owned and controlled by Schlage and indirectly by Allegion. *Id*.

Wexler and Defendants also entered into various related agreements, including an employment and non-compete agreements. *Id*. ¶ 51. Wexler's employment agreement provided that he would have the title of "President Emeritus" of Zero Group. *Id.* ¶ 52. While the agreement had an eighteen-month minimum term, Mehrotra assured Wexler that Defendants

intended to employ him until he retired, and further assured him that even after retirement, he would have the President Emeritus title and Allegion board position for "life" so long as Allegion carried Zero products. *Id.*

Schlage also entered into lease agreements with Zero Realty, Zero Ohio, Zero Realty NC, and Concord allowing Schlage to use facilities already in use by Zero International. *Id.* ¶¶ 54–55. Additionally, Wayne Bewley, an Allegion product manager, convinced Wexler to retrofit a new building he had acquired in Burgaw, North Carolina (the "Burgaw facility") so that Allegion and Schlage could use it. *Id.* ¶ 58. Although Wexler already had a factory in Wallace, North Carolina used by Zero, Bewley told him that the head of Allegion's Americas Division maintained a summer home thirty miles from Burgaw, and assured him that if he moved the Zero operation to Burgaw, Defendants would enter into a 40-year lease for the facility. *Id.* ¶ 59. Wexler agreed and undertook the significant expense of retrofitting the Burgaw facility. *Id.* ¶ 61. Defendants never reimbursed Wexler for the costs of retrofitting. *Id.* The lease agreements for all of the facilities leased by Schlage, including the Burgaw facility, were subject to two-year terms, renewable in two-year increments. *Id.* Wexler alleges that even though the written lease agreements were for two-year terms, Bewley assured him that this was merely a standard term required by Allegion's internal policies and that Defendants intended to lease the facilities long term. *Id.* ¶¶ 56, 61.

Defendants also agreed to assume contractual relationships that Zero International had with its overseas distributors, Zero Asia, Zero Latina, and Zero East (collectively, the "Distributor Plaintiffs"). *Id.* ¶ 62. Prior to the APA, Zero International had exclusive contracts with each of the Distributor Plaintiffs, which it provided to Defendants. *Id.* ¶ 63. After the APA closed, Mehrotra and Bewley, as Defendants' agents, told Wexler, as the distributors'

representative, that Defendants agreed to use the Distributor Plaintiffs as the exclusive

distributors for New Zero on the same terms as had been previously set forth in their written

contracts with Zero International concerning exclusivity, territory, pricing and commissions, and

payment terms. *Id.* ¶ 64. According to Wexler, the parties further agreed that the contract period

for each Distributor Plaintiff would last for so long as Defendants sold Zero products in the

distributor's respective region. *Id.*

Wexler alleges that shortly after the close of the APA, Defendants "began to reveal their

true intention." *Id.* ¶ 82. He alleges that in the early summer of 2015, Defendants began to

ignore his advice about managing the affairs of New Zero, and almost entirely stopped

communicating with him by mid-summer. *Id.* ¶ 84. Around that same time, Defendants also

began planning to lay off Zero's workforce in the Bronx and other factories in the U.S. and

began preparing to close its U.S. factories altogether. *Id.* ¶ 85. On the morning of September 17,

2015, Mehrotra traveled to Wexler's office in the Bronx, accompanied by Schlage's head of

human resources and two security guards. *Id.* ¶ 87. Mehrotra told Wexler that he was fired, and

after giving him a few minutes to gather whatever belongings he could carry, the security guards

escorted him from the building, as his friends and colleagues watched. *Id.* After Wexler had

been removed from the premises, Defendants assembled New Zero's employees and told them

that Wexler had been terminated because of something he allegedly did in the office. *Id.* ¶ 88.

They instructed the employees that they were not permitted to talk to Wexler or his family. *Id.*

Wexler alleges that Defendants defamed him by falsely informing prominent members of

the acoustical, fireproofing, and door-hardware industries that Wexler's work for Defendants had

been unsatisfactory. *Id.* ¶ 94. Wexler also alleges that Defendants informed these industry

leaders that he was escorted out of the building after his firing, suggesting that he was dishonest

and unworthy of continued employment.  *Id.*  Wexler contends that Defendants never expressed

dissatisfaction with his work and later sent him a letter stating that he had been terminated

without cause as part of a general "reduction in force."  *Id.* ¶ 95.

Wexler alleges that Defendants further defamed him when they sent a marketing bulletin

entitled "Zero International Product Availability Update" to Zero customers and industry

members in December 2016 (the "December 2016 Bulletin").  *Id.* ¶ 97.  Wexler asserts that the

bulletin falsely claimed that Zero products developed under Wexler had "quality issues" and that

the "old Zero management" had acted unethically by circumventing proper safety and quality

review of products he rushed to market.[3]  *Id.* ¶ 98.  According to Wexler, Defendants derisively

called these products "Engineered Specials," advising customers that they were so defective that

Allegion was pulling them from the market pending review and redesign.  *Id.*  Wexler claims that

the false statements in the bulletin impugned his ethics, honesty, and integrity.  *Id.* ¶ 102.

Moreover, Wexler asserts, Defendants' overall conduct damaged his reputation and interfered

with his future business prospects.  *Id.* ¶¶ 121–126.  Since his employment with New Zero was

terminated, Wexler has been stripped of his membership in various industry organizations, and

has lost his ability to continue speaking and teaching engagements and to serve as a credentialed

expert in the industry.  *Id.* ¶¶ 123–124.

By late 2016, Defendants had fired nearly all of the Zero employees in the Bronx and

elsewhere in the U.S., and moved Zero's headquarters to Indiana, where Schlage is located.  *Id.* ¶

---

[3] The bulletin stated the following:  "During the transition of Zero International from the Bronx to our Indianapolis facility and the subsequent launch of Zero into the AX system, we discovered several challenges and quality issues with the Zero product that needed to be corrected.  One challenge in particular was that the old Zero management saw the catalog as an easy means of testing the market for products that we at Allegion would call 'Engineered Specials.'  Often times there were little to no bill of materials, or in some cases product had never been built [] or sold.  To address these concerns and in order to provide high quality products, we have been forced to place some of the products on production hold while improved solutions are identified and move other items [through] the engineered specials process."  Am. Compl. ¶ 99.

89.  Wexler asserts that, in addition to gutting Zero's work force, Defendants physically

destroyed Zero's factory machinery, which had been developed, designed, and calibrated by

Zero International to make its unique high quality door/window seals and weather-stripping.  *Id*.

¶ 90.  Allegion personnel physically smashed the machines, rendering them inoperable and

irreparable.  *Id*. ¶ 91.  In March 2017, Schlage notified that it would not renew its lease of the

various facilities it had leased from Zero Realty, Zero Ohio, and Zero NC, including the Burgaw

facility.  *Id*. ¶¶ 104, 107.  Defendants also failed to use the Distributor Plaintiffs as their

exclusive distributors for Zero products in the distributors' regions.  *Id.* ¶¶ 117–120.

## II.     Procedural History

On February 29, 2016, Wexler, the Distributor Plaintiffs, Zero Realty, and Zero Ohio

brought this action against Allegion UK and Schlage in New York State Supreme Court, Bronx

County, alleging age discrimination, defamation, breach of various contracts, including Wexler's

employment contract and the oral distributor contracts with Zero Latina, Zero Asia, and Zero

East, unjust enrichment, and conversion.  Doc. 2.  On March 28, 2016, Defendants removed the

case to this Court on the basis of diversity jurisdiction.  *Id*.  On November 9, 2016, the Court

denied Plaintiffs' motion to remand the case back to state court.  Doc. 36.

On March 9, 2017, the Court granted in part and denied in part Defendants' motion to

dismiss, permitting Wexler to proceed on his defamation claim and granting him leave to replead

his age discrimination claims, and granting the Distributor Plaintiffs leave to replead their breach

of contract claims.  *See* March 2017 Order.  Plaintiffs filed an amended complaint on April 28,

2017, naming Zero NC and Concord as additional plaintiffs and naming Allegion plc as an

additional defendant.  *See* Am. Comp.  The Amended Complaint dropped Wexler's age

discrimination claim and breach of contract claim arising from his employment contract, and added various new state law claims. *Id*.

Pending before the Court is Defendants' partial motion to dismiss Plaintiffs' claims for fraudulent inducement (Count One); tortious interference (Count Two); defamation based on the December 2016 bulletin (Count Four); breach of contract based on Wexler's honorary board position (Count Five); breach of the contracts with the Distributor Plaintiffs (Counts Six, Seven, and Eight); promissory estoppel based on Defendants' promise to continue using the Distributor Plaintiffs as exclusive distributors (Counts Nine, Ten, and Eleven); promissory estoppel based on Defendants' promise to lease the Burgaw facility for decades (Count Twelve); and unjust enrichment (Count Eighteen). Doc. 67. Also pending before the Court is Allegion plc's motion to dismiss for lack of personal jurisdiction. *Id*.

## III.   Legal Standard

### A.  Rule 12(b)(2) Motion to Dismiss:  Lack of Personal Jurisdiction

"A plaintiff opposing a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction has the burden of establishing that the court has jurisdiction over the defendant." *BHC Interim Funding, LP v. Bracewell & Patterson, LLP*, No. 02 Civ. 4695 (LTS) (HBP), 2003 WL 21467544, at *1 (S.D.N.Y. June 25, 2003) (citing *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)). To meet this burden, the plaintiff must plead facts sufficient for a prima facie showing of jurisdiction. *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001). The court construes all of the plaintiff's allegations as true and resolves all doubts in its favor. *Casville Invs., Ltd. v. Kates*, No. 12 Civ. 6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008); *Martinez v. Bloomberg LP*, 883 F. Supp. 2d

511, 513 (S.D.N.Y. 2012)). "However, a plaintiff may not rely on conclusory statements without any supporting facts, as such allegations would lack the factual specificity necessary to confer jurisdiction." *Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14 Civ. 3756 (LGS), 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014) (internal quotation marks and citations omitted).

### B. Rule 12(b)(6) Motion to Dismiss:  General Legal Standard

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Koch*, 699 F.3d at 145.  However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## IV.    Discussion

### A.  Wexler's Fraudulent Inducement Claim (Count One)

Wexler alleges that Defendants fraudulently induced him into selling the assets of Zero International by making various false representations about their plans for the company and its ongoing relationship with Wexler.  Am. Compl. ¶ 130.  Specifically, Wexler alleges that

Defendants, through Mehrota and Bewley, falsely represented that they (1) intended to preserve Zero's relationship with the Bronx community; (2) had no intention of changing the Zero products and would maintain the high quality of Zero products; (3) would classify the Zero product line as a high quality product; (4) would give Wexler an honorary position on Allegion's internal board of directors for the U.S. commercial mechanical division; (5) intended to keep Zero's current workforce in the Bronx, Ohio, and North Carolina; (6) would continue to use Zero Latina, Zero Asia, and Zero East as overseas distributors of Zero products; and (7) would renew the two-year lease for the Burgaw facility for at least forty years. *Id.*

To state a claim for fraud under New York law, a plaintiff must allege: "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (citation omitted). A plaintiff also must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which applies to any claim that "sounds in fraud" and requires that a plaintiff "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see Rombach v. Chang*, 355 F.3d 164, 170–71 (2d Cir. 2004). "In essence, Rule 9(b) places two further burdens on fraud plaintiffs—the first goes to the pleading of the circumstances of the fraud, the second to the pleading of the defendant's mental state." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015). With respect to the first, a plaintiff must: (1) specify the statements he contends are fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements are fraudulent. *Id.* With respect to the second, a plaintiff must allege facts "that give rise to a strong inference of fraudulent intent." *Id.* (quoting

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006)). A plaintiff may establish the requisite "strong inference of fraud" by alleging facts that either "show that defendants had both motive and opportunity to commit fraud," or "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner*, 459 F.3d at 290–91 (internal quotation marks and citation omitted). "Where the plaintiff pleads scienter by conscious misbehavior or recklessness rather than motive, 'the strength of the circumstantial allegations must be correspondingly greater.'" *Medis Inv. Grp. v. Medis Techs., Ltd.*, 586 F. Supp. 2d 136, 141–42 (S.D.N.Y. 2008) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)); *see also In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 415 (S.D.N.Y.2007) (noting that "the strength of the recklessness allegations must be greater than that of allegations of garden-variety fraud, *and* the inference of recklessness must be at least as compelling as any opposing inferences").

In order to raise a strong inference of fraudulent intent through "motive and opportunity," a plaintiff must allege that the defendant "benefited in some concrete and personal way from the purported fraud." *Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 72 (S.D.N.Y. 2010) (citation omitted). In the corporate context, "sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Bigsby v. Barclays Capital Real Estate, Inc.*, 170 F. Supp. 3d 568, 578 (S.D.N.Y. 2016) (internal punctuation marks and citation omitted). The Second Circuit has held that "motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit*, 264 F.3d at 139 (quoting *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000)). Examples of insufficient motives include "(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation." *Id.*

Here, Wexler contends that he has sufficiently raised a strong inference of fraudulent intent based on "motive and opportunity." *See* Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pls.' Mem.") (Doc. 75), at 10. He asserts that Defendants were motivated by a desire to "eliminate [him] as a potential critic of their plan to consolidate their market dominance . . . by acquiring the Zero brand and replacing the high-quality (and relatively expensive) domestic manufacturing of Zero products with lesser quality products made overseas." *Id*. In other words, Wexler claims that Defendants were motivated by a desire to increase Allegion's customer base (i.e., "consolidate their market dominance"). As this Court has previously held, "the desire for a corporation to expand its customer base is a generic motive similarly possessed by most corporations, and thus, is insufficient to plead scienter." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 162 (S.D.N.Y. 2015); *see also In re JP Morgan Chase Secs. Litig.*, 363 F. Supp. 2d 595, 621 (S.D.N.Y. 2005) ("Generalized allegations of intent to maintain lucrative business relationships and to establish new ones do not set forth a motive for scienter purposes."). Because Wexler alleges a generic motive possessed by most, if not all, corporations, the Court does not find that Defendants "benefited in some concrete and personal way from the purported fraud." *See Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 468 (S.D.N.Y. 2013) (quoting *Novak*, 216 F.3d at 307–08).

Secondarily, Wexler contends that "Defendants' pattern of inexplicable (and economically irrational) destruction and malice toward Wexler, as alleged in the Amended Complaint, amounts to 'misbehavior' and 'recklessness,' which is an independent ground for inferring the requisite intent." Pls.' Mem. at 11. Specifically, Wexler claims that Defendants' decision to terminate his employment, lay off the U.S. workforce, and dismantle Zero's custom-made machinery shortly after the APA closed inexplicably damaged the Zero brand and serves as

13

circumstantial evidence that they never intended to follow through on their pre-APA representations. *Id*. at 11–12. Defendants, on the other hand, argue that Wexler's allegations are also consistent with a business owner immediately reviewing the operations of a new asset and making changes to bring it in line with its existing organization, and that this scenario is more compelling, based on the facts alleged in the Amended Complaint, than Wexler's sinister one. Reply Memorandum of Law in Support of Defendants' Motion to Dismiss ("Reply Mem.") (Doc. 81), at 3–4.

To qualify as "strong," an inference of fraud "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of the other explanations." *In re CCT Commc'ns, Inc.*, No. 07 Civ. 10210 (SMB), 2008 WL 2705471, at *15 (Bankr. S.D.N.Y. July 2, 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 324 (2007)). "The court must consider the inferences urged by the plaintiff and the competing inferences rationally drawn from the facts alleged." *Id*. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. Removing from consideration Wexler's conclusory characterizations of Defendants' actions—such as his statement that the destruction of machinery was "irrational"— the crux of his argument is that Defendants' significant changes to the operation of New Zero shortly after the APA indicate that they never intended to carry out their promises to Wexler. While this may be a plausible inference, it is not as compelling as other inferences supported by the allegations, such as the scenario of a new owner assessing a new asset and making changes driven by logistics and profitability. Accordingly, the Court finds that Wexler has failed to plead a strong inference of fraudulent intent, and Defendants' motion to dismiss Count I is GRANTED.

## B.  Wexler's Tortious Interference Claim (Count Two)

Wexler claims that Defendants tortuously interfered with his prospective economic advantage by (1) making defamatory statements about him, (2) stripping him of his "President Emeritus" title, and (3) stripping him of the position on an internal Allegion board of directors he was allegedly promised.  Am. Compl. ¶¶ 139–48.  Specifically, he alleges that Defendants' actions interfered with his economic relationships with various entities, and caused him to lose economic opportunities for paid honorariums, expert fees, speaking fees, and lecture/teaching fees.  *Id.* ¶ 143.

Defendants contend that Wexler's tortious interference claim fails because it is duplicative of his defamation claims.  Defs.' Mem. at 10.  "New York law considers claims sounding in tort to be defamation claims . . . where those causes of action seek damages only for injury to reputation, [or] where the entire injury complained of by plaintiff flows from the effect on his reputation."  *Hengjun Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) (quoting *Jain v. Sec. Indus. and Fin. Mkts. Ass'n.*, No. 08 Civ. 6463, 2009 WL 3166684, at *9 (S.D.N.Y. Sept. 28, 2009)).  Here, the injury underlying Wexler's tortious interference claim stems directly from the alleged effect of Defendants' actions on his reputation.  According to Wexler, Defendants' actions caused him to lose important industry relationships, which in turn caused him to lose economic opportunities.  *See* Am. Compl. ¶ 143.  While he does not expressly link losing those economic opportunities to reputational harm, the only plausible reading of the Amended Complaint is that Wexler lost his industry connections and future economic opportunities because Defendants' actions injured his reputation and credibility in the industry.

Moreover, and perhaps most importantly, Wexler admits that the conduct underpinning his tortious interference claim "amounted to the independent tort of defamation in addition to

interfering with [his] prospective economic opportunities." *Id.* ¶ 144; *see also id.* ¶ 126 ("As a direct result of defendants' fraud and defamation of Wexler, defendants have interfered with Wexler's business relationships in the construction industry ensuring that he is unable to obtain teaching positions, speaking engagements or work as a credentialed expert consultant in the industry."). Accordingly, the Court finds that Wexler's tortious interference claim is impermissibly duplicative because it flows entirely from the effect of Defendants' actions on his reputation, and Defendants' motion to dismiss Count Two is GRANTED.

### C. Wexler's New Defamation Claim (Count Four)

Wexler alleges that Defendants defamed him when they circulated false statements about him in the December 2016 Bulletin. Am. Compl. ¶¶ 97–99. To establish a claim of defamation under New York law, a plaintiff must plead "(1) a defamatory statement of fact; (2) that is false; (3) published to a third party; (4) 'of and concerning' the plaintiff; (5) made with the applicable level of fault on the part of the speaker; (6) either causing special harm or constituting slander per se; and (7) not protected by privilege." *FTA Mkt. Inc. v. Vevi, Inc.*, No. 11 Civ. 4789 (VB), 2012 WL 383945, at *6 (S.D.N.Y. Feb. 1, 2012) (citing *Albert v. Loksen,* 239 F.3d 256, 265–66 (2d Cir. 2001)). Defendants contend that Wexler's new defamation claim fails because the allegedly defamatory statements (1) are not "of and concerning" Wexler, (2) are not capable of defamatory meaning, and (3) are insufficient to constitute defamation *per se*. Defs.' Mem. 13–18. The Court addresses each argument in turn.

### 1. "Of and Concerning" Wexler

As Defendants point out, the December 2016 Bulletin does not mention Wexler by name. *See id.* at 14; *see also* Am. Compl. ¶ 99. That fact, however, is not dispositive because a defamatory publication may be "of and concerning" a plaintiff as long as "persons reading it

will, in the light of the surrounding circumstances, be able to understand that it refers to the [plaintiff]." *Algarin v. Town of Wallkill*, 421 F.3d 137, 139 (2d Cir. 2005) (citation omitted). "Although the 'of and concerning' requirement is generally an issue of fact, which the jury alone may decide, the Court properly may dismiss an action pursuant to Rule 12(b)(6) where the statements 'are incapable of supporting a jury's finding that the allegedly libelous statements refer to plaintiff.' Whether the complaint alleges facts sufficient to demonstrate a reasonable connection between the plaintiff and the alleged libel is thus a question for the Court." *Church of Scientology Int'l v. Time Warner Inc.*, 806 F. Supp. 1157, 1160 (S.D.N.Y. 1992) (quoting *Handelman v. Hustler Magazine, Inc.*, 469 F. Supp. 1048, 1050 (S.D.N.Y. 1978)). "In determining whether the 'of and concerning' requirement has been sufficiently pleaded, the Court must consider whether those who know the plaintiff, upon reading the statements, would understand that the plaintiff was the target of the allegedly libelous statement." *Id*. at 1160; *see also Algarin*, 421 F.3d at 139 (dismissing complaint where it failed to "set forth circumstances from which to infer the identity of any particular officers who might be understood to have been the subject of any defamatory allegations in the report"); *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 925 (2d Cir. 1987) ("The test is whether the libel designates the plaintiff in such a way as to let those who knew [the plaintiff] understand that she was the person meant. It is not necessary that all the world should understand the libel.") (internal quotations omitted).

Wexler has sufficiently alleged that persons reading the December 2016 bulletin would have been able to understand that he was the intended target. According to Wexler, his wide-spread reputation in the industry made him "synonymous with Zero" and people in the industry would have understood that a reference to "old Zero management" was effectively a reference to Wexler. Pls.' Mem. at 29. Given the facts alleged in the Amended Complaint, and drawing all

reasonable inferences in Wexler's favor, the Court finds that the relevant language in the December 2016 bulletin is capable of supporting a jury's finding that it refers to Wexler. *See Excellus Health Plan, Inc. v. Tran*, 287 F. Supp. 2d 167, 174 (W.D.N.Y. 2003) ("[T]he court may grant a motion to dismiss a defamation claim where the challenged statements 'are incapable of supporting a jury's finding that the allegedly libelous statements refer to plaintiff.'" (quoting *Handelman*, 469 F. Supp. at 1050)).

### 2. Defamatory Meaning

A statement must have a reasonably susceptible defamatory meaning for it to be actionable defamation. A statement is defamatory if it "exposes an individual to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . induces an evil opinion of one in the minds of right-thinking persons, and ... deprives one of . . . confidence and friendly intercourse in society." *Croton Watch Co., Inc. v. Nat'l Jeweler Magazine, Inc.*, No. 06 Civ. 662 (GBD), 2006 WL 2254818, at *4 (S.D.N.Y. Aug. 7, 2006) (citations and internal modifications omitted). "A publication defamatory of a . . . product is not a libel against its owner unless the owner himself is accused of disreputable conduct." *Bilinski v. Keith Haring Found., Inc.*, 632 F. App'x 637, 640 (2d Cir. 2015) (summary order) (quoting *El Meson Espanol v. NYM Corp.*, 521 F.2d 737, 738–40 (2d Cir. 1975)).

Defendants contend that the December 2016 Bulletin is not capable of defamatory meaning because it does not specifically attribute the "challenges and quality issues with the Zero product that needed to be corrected" to Wexler. Defs.' Mem. at 16. Defendants' argument is unavailing because the bulletin expressly links at least one of the "challenges and quality issues" to "old Zero management," which the Court has already determined could be understood by a jury as a reference to Wexler. Specifically, the bulletin states that one of the challenges was

related to old Zero management viewing the catalogue as an "easy means of testing the market for products that we at Allegion would call 'Engineered Specials.'"  Am. Compl. ¶ 99.

Defendants further argue that the bulletin's "Engineered Specials" reference "does not imply any negative connotation."  Defs.' Mem. at 16.  This argument is similarly unavailing.  The bulletin states that "to address these concerns"—concerns which necessarily include the "Engineered Specials" issue—"we have been *forced* to place some of the products on production hold while improved *solutions* are identified."  Am. Compl. ¶ 99. (emphasis added).  A third party reading this language could take it to mean that Wexler took short-cuts in the design and manufacturing process that resulted in quality issues that were serious enough to force Allegion to withhold production, and that his actions were disreputable.  Therefore, viewed in context and drawing all inferences in Wexler's favor, a jury could reasonably understand the bulletin as exposing Wexler to negative opinions in the industry.

### 3.  Defamation *per se*

Even if the December 2016 Bulletin did not concern Wexler and was not reasonably susceptible of defamatory meaning, the claim would still survive because the statements constitute defamation *per se*.  Wexler alleges defamation *per se* for injury in his profession and trade.  *Id*. ¶ 156.  Defamation *per se* consists of any one of the following:  (1) a statement charging an individual with a serious crime; (2) a statement that tends to injure another in his trade, business, or profession; (3) a statement that claims an individual has a "loathsome disease;" or (4) a statement "imputing unchastity to a woman."  *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 550 (S.D.N.Y. 2011) (citing *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992)).  A statement that injures another in his "trade, business, or profession" is one that refers to a "matter of significance and importance for [the operation of the

business], rather than a more general reflection upon the plaintiff's character or qualities." *Liberman*, 80 N.Y.2d at 436. "The allegedly defamatory statement must be targeted at the specific standards of performance relevant to the plaintiff's business and must impute conduct that is 'of a kind incompatible with the proper conduct of the business, trade, profession or office itself.'" *Pure Power Boot Camp, Inc.*, 813 F. Supp. 2d at 550 (internal quotation marks and citation omitted).

Wexler claims that the December 2016 bulletin suggests that he "used deceptive marketing tactics to sell products that were not properly tested, designed and ready to market" and "impugned Wexler's life work in marketing high quality door products." Pls.' Mem. at 31. According to Wexler, this was "of significance and importance" in his industry. *Id*. Wexler further claims that by suggesting that he acted unethically and improperly, the bulletin imputed conduct to him that is "incompatible with the proper conduct of his business, trade and profession." *Id*. Defendants, on the other hand, contend that the "only statement even remotely referable to Wexler" is the statement regarding "Engineered Specials" and that whether Wexler used the catalog as a means to test the market for "Engineered Specials" is not a matter of significance or importance to Wexler's business. Defs.' Mem. at 18. Defendants further contend that the bulletin does not impute conduct incompatible with the proper conduct of Wexler's business because "it is clear that 'Engineered Specials' are simply products specifically manufactured at a customer's request." *Id*.

The Court finds that Wexler has sufficiently alleged defamation *per se*. The December 2016 Bulletin could reasonably be read to suggest that Zero products developed under Wexler had quality issues and that Wexler acted improperly by marketing products that were untested and not ready for consumption by consumers, "forcing" Allegion to halt production. Interpreting

the bulletin this way—calling into question Wexler's character and the quality of his products—is easily a matter of significance, and a jury could reasonably conclude that the conduct described in the bulletin was incompatible with the proper conduct of Wexler's trade.

Accordingly, the Court finds that Wexler has sufficiently alleged a defamation claim based on the December 2016 Bulletin, and Defendants' motion to dismiss is DENIED.

### B. Wexler's Breach of Contract Claim (Count Five)

Wexler claims that prior to executing the APA, Allegion agreed that it would create an honorary position for him on its internal board of directors for its U.S. commercial mechanical division, and that he would remain in that honorary board position as long as Allegion carried the Zero product line.  Am. Compl. ¶ 166.  Wexler alleges that although Allegion initially invited him to the board's meetings, Allegion breached the agreement by subsequently prohibiting him from attending any other board meetings and failing to grant him a position and title as an honorary board member.  *Id.* ¶ 168.

Defendants contend, among other things, that Allegion's alleged oral promise is not an enforceable agreement because it is not supported by consideration.  Defs.' Mem. at 20.  Under New York law, to be valid, a contract must be supported by consideration.  *Murray v. Northrop Grumman Info. Tech., Inc.*, 444 F.3d 169, 178 (2d Cir. 2006).  Consideration to support an agreement exists where there is "either a benefit to the promisor or a detriment to the promisee."  *Hollander v. Lipman*, 65 A.D.3d 1086, 1087, 885 N.Y.S.2d 354 (N.Y. App. Div. 2009) (quoting *Weiner v. McGraw–Hill, Inc*., 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441, 445 (N.Y. 1982)).  Thus, New York law interprets the requirement of consideration broadly and "[e]ven consideration of the most minimal value is valid; the 'proverbial peppercorn' is sufficient."  *Gross Mach. Grp. v. M.V.*, No. 91 Civ. 0460 (JSM), 1993 WL 77326, at *1 (S.D.N.Y. Mar. 17,

1993) (internal citation omitted) ("Far from consideration needing to be coextensive or even proportionate, the value or measurability of the thing forborne or promised is not crucial so long as it is acceptable to the promisee.").

Wexler argues that consideration existed in that the parties understood that they would mutually benefit from his membership on the Allegion board. Pls.' Mem. at 19. The Amended Complaint, however, is devoid of any indication that Wexler and Allegion understood they would mutually benefit from Wexler being on the board. The paragraphs on which Wexler relies to make this argument only allege that Allegion wanted to benefit from Wexler's "emeritus" role at New Zero; they make no mention of benefits to Allegion flowing from Wexler's alleged participation on the board. Am. Comp. ¶¶ 44–45, 50, 52. Moreover, while Wexler alleges that he "fully performed his obligations under the parties' oral agreement," the Amended Complaint is utterly silent with respect to what those obligations were. *Id*. ¶¶ 165–69. Thus, Wexler has failed to identify *any* detriment to himself as promisee or benefit to Allegion arising from his membership on the board. *See id*. Because Wexler fails to allege even the proverbial peppercorn, he has failed to sufficiently plead that an enforceable agreement existed requiring Allegion to appoint him to a board position. Accordingly, Defendants' motion to dismiss Count Five is GRANTED.

### C. The Distributor Plaintiffs' Claims for Breach of Oral Distribution Agreements (Counts Six, Seven, and Eight )

Counts Six through Eight allege that Defendants breached oral agreements to use the Distributor Plaintiffs as exclusive distributors of Zero products in the Middle East, South America, and Asia. Am. Compl. ¶¶ 170–87. Plaintiffs claim that Zero International had written contracts for exclusive overseas distribution with the Distributor Plaintiffs and that, prior to the APA, Zero International provided those contracts to Defendants. *Id*. ¶¶ 62–63. After the APA

closed, Defendants allegedly told the Distributor Plaintiffs, through Wexler, that they would continue to use them as exclusive distributors in their regions on the same terms set forth in their written contracts with Zero International concerning exclusivity, territory, pricing and commission, and payment terms. *Id.* ¶ 64. The parties further agreed that the contract period for each distributor would last for as long as Defendants sold Zero products in the distributor's respective region. *Id.* The Distributor Plaintiffs claim that Defendants breached the oral agreements in 2016. *Id.* ¶¶ 118–20.

Defendants first contend that the Distributor Plaintiffs have failed to plead a valid contract because (1) they have not alleged any of the essential terms of the purported distributorship agreements, making the Amended Complaint "bereft of any facts necessary to show a clear and definite agreement," and (2) the purported agreements lacked consideration. Defs.' Mem. at 22–23. The Court disagrees. "[A] plaintiff need not attach a copy of the contract or plead the contract's term's verbatim," as long as the complaint "set[s] forth the terms of the agreement upon which liability is predicated." *Castorino v. Citibank N.A.*, No. 07 Civ. 10606 (PAC), 2008 WL 5114482, at *2 (S.D.N.Y. Dec. 5, 2008). The Distributor Plaintiffs have sufficiently described the essential contractual terms upon which Defendants' breach is based: Defendants agreed to use the Distributor Plaintiffs as exclusive distributors of Zero products in certain geographic regions as long as Defendants sold Zero products in those regions, in exchange for the Distributor Plaintiffs maintaining Zero customers in those regions as New Zero customers and continuing to obtain sales of Zero products on the same terms as prior to APA. Am. Compl. ¶¶ 171, 177, 183. Defendants' lack-of-consideration argument also fails because a promise to maintain customers and obtain sales in exchange for exclusivity is more than the "proverbial peppercorn."

Defendants also contend that enforcement of the alleged oral distribution agreements is barred by Section 2-201 of the New York Uniform Commercial Code ("UCC"), which provides that "a contract for the sale of goods for the price of $500 or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." N.Y. U.C.C. Law § 2-201. Section 2-201 "has been applied to distributorship agreements which necessarily involve the purchase of more than $500 of goods, but not to a contract that fundamentally or predominantly involves performance of services, rather than sale of goods." *Marbelite Co., Inc. v. Nat'l Sign & Signal Co., Inc.*, 2 F. App'x 118, 120 (2d Cir. 2001). "In determining whether or not a contract is one of sale or to provide services, we must look to the 'essence' of the agreement. When service predominates, the incidental sale of items of personal property[ ] does not alter the basic transaction." *Id*. (quoting *North American Leisure Corp. v. A & B Duplicators, Ltd.,* 468 F.2d 695, 697 (2d Cir.1972)).

The parties dispute whether the alleged oral distributor agreements were for services or the sale of goods. The Distributor Plaintiffs assert that the agreements were "long-term, exclusive *service* agreements, not one-off sale of goods subject to the UCC," Pls.' Mem. at 21, while Defendants contend that their contractual relationship with the Distributor Plaintiffs was one for the sale of Zero products. *See* Defs.' Reply at 20. At this stage of the litigation, the Court is unable to determine whether the essence of the agreements was for the sale of goods or the provision of services. Therefore it would be inappropriate for the Court to decide whether Section 2-201 applies as a matter of law without regard to the facts that may be adduced during discovery.

Finally, Defendants contend that the Distributor Plaintiffs' breach of contract claims are barred by the APA's merger clause. Defs.' Mem. at 24. They argue that even though the Distributor Plaintiffs are not parties to the APA, the merger clause can be enforced against them because they are "in privity" with Wexler, who *is* bound by the merger clause. Reply Mem. at 13. "[A] contract cannot bind a non-party." *Int'l Customs Assocs., Inc. v. Ford Motor Co.*, 893 F. Supp. 1251, 1255 (S.D.N.Y. 1995). Defendants, however, point to case law suggesting that contractual provisions may be applied to non-signatories that are "closely related" to a signatory. Reply Mem. at 13. The body of case law to which Defendants refer, however, has developed in the context of forum selection clauses, and its effect on the application of other types of provisions, such as merger clauses, is unclear. *See LaRoss Partners, LLC v. Contact 911 Inc.*, 847 F. Supp. 2d 147, 159 (E.D.N.Y. 2012).

Moreover, cases applying forum selection clauses to non-signatories have done so when the non-signatory is "so closely related to the dispute . . . that it becomes foreseeable that it will be bound [by the forum selection clause]." *Leviton Mfg. Co. v. Reeve,* 942 F. Supp. 2d 244, 257 (E.D.N.Y. 2013) (internal quotation marks and citations omitted); *see Kasper Global Collection & Brokers, Inc. v. Global Cabinets & Furniture Mfrs. Inc.*, No. 10 Civ. 5715 (DF), 2013 WL 3388427, at *13 (S.D.N.Y. July 1, 2013) ("Courts have held that forum-selection clauses can be enforced against non-signatories who are closely related to a signatory, such that enforcement of the forum selection clause is foreseeable by virtue of the relationship between the signatory and the party sought to be bound.") (internal quotation marks and citations omitted); *In re Optimal U.S. Litig.*, 813 F. Supp. 2d 351, 369 (S.D.N.Y. 2011) ("A forum selection clause may bind non-parties to a contract if the relationship between the non-party and the signatory [is] sufficiently close so that the non-party's enforcement of the forum selection clause is foreseeable by virtue of

25

the relationship between the signatory and the party sought to be bound.") (internal quotation marks and citations omitted).  Other than asserting that the Distributor Plaintiffs are in privity with Wexler because Wexler owns majority stakes in them and has authority to act on their behalf, Defendants have failed to articulate any convincing reasons why the Distributor Plaintiffs should have reasonably foreseen that the APA's merger clause would be enforced against them.  The fact that the APA referred to the Distributor Plaintiffs as "related persons" is insufficient, without more, to establish that enforcement of the APA's terms against them was foreseeable.  Thus, Defendants have failed to demonstrate that the APA's merger clause bars enforcement of the alleged oral distribution agreements.

Accordingly, Defendants' motion to dismiss Counts Six through Eight is DENIED.

### D.  The Distributor Plaintiffs' Promissory Estoppel Claims Based on the Alleged Oral Distribution Agreements (Counts Nine, Ten, and Eleven)

In the alternative to their breach of contract claims, the Distributor Plaintiffs assert promissory estoppel claims arising from Defendants' promise to continue using them as exclusive overseas distributors.  Am. Compl. ¶¶ 188–208.  To prevail on a claim for promissory estoppel, a plaintiff must establish three elements:  (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the party to whom the promise was made, and (3) an injury to the party to whom the promise was made by reason of the reliance.  *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995).  "When promissory estoppel is interjected to overcome a valid Statute of Frauds defense, it 'has been strictly construed to apply only in those rare cases where the circumstances [are] such as to render it unconscionable to deny the oral promise upon which the promisee has relied.'"  *Robins v. Zwirner*, 713 F. Supp. 2d 367, 376 (S.D.N.Y. 2010) (quoting *Stillman v. Townsend*, No. 05 Civ. 6612 (WHP), 2006 WL 2067035, at *2–3 (S.D.N.Y. 2006)).

Reading the Amended Complaint in the light most favorable to the Distributor Plaintiffs, the Court finds that it sufficiently establishes claims for promissory estoppel at this stage. First, contrary to what Defendants contend, the Distributor Plaintiffs allege a clear and unambiguous promise by Defendants to continue using them as exclusive distributors of Zero products on the same terms that existed pre-APA and for as long as Defendants sold Zero products in their regions. Am. Compl. ¶¶ 64, 189, 196, 203.

Second, based on the facts as alleged, the Distributor Plaintiffs' reliance on that promise was reasonable. Defendants raise various arguments based on the existence of the APA, including that it was unreasonable for the Distributor Plaintiffs to rely on oral promises when the APA made no reference to exclusive distribution agreements. As discussed above, the Distributor Plaintiffs were not parties to the APA, and the fact that different parties had a different fully integrated written agreement with Defendants is of little relevance to the Distributor Plaintiff's separate understanding with Defendants. Defendants also contend that it would have been unreasonable to expect that any business would use an exclusive distributor on a "permanent" basis. Defs.' Mem. at 27. Even if this were the case, the Distributor Plaintiffs have not alleged that Defendants promised to use them as exclusive distributors *in perpetuum*. Instead, they allege that Defendants promised to use them exclusively as long as Defendants continued to sell Zero products in their regions. Am. Compl. ¶ 66. Reliance on such a promise is not *per se* unreasonable. Based on the totality of the alleged facts, and having considered Defendants' arguments, the Court cannot determine at this juncture that, as a matter of law, the Distributor Plaintiff's reliance on Defendants' alleged promises was unreasonable.

Finally, the Distributor Plaintiffs have sufficiently alleged that they were injured as a result of Defendants' failure to keep their promise. Defendants, however, contend that the

Distributor Plaintiffs were required to plead unconscionable injury. A plaintiff is only required to plead unconscionable injury when the promissory estoppel claim is brought because the alternate contract claim is barred by the applicable statute of frauds. *Polargrid LLC v. Videsh Sanchar Nigam Ltd.*, No. 04 Civ. 9578 (TPG), 2006 WL 903184, at *3 (S.D.N.Y. Apr. 7, 2006). As discussed stated above, the Court is unable to determine whether New York's applicable statute of frauds (Section 2-201) bars the Distributor Plaintiff's contractual claims because whether the alleged contracts were service contracts or contracts for the sale of goods remains an open question at this stage. As such, the Court is correspondingly unable to determine whether the Distributor Plaintiffs are required to plead unconscionable injury, making Defendants' argument premature.[4] Accordingly, Defendants' motion to dismiss Counts Nine through Eleven is DENIED.

### E. Wexler and Zero NC's Promissory Estoppel Claim Based on the Burgaw Facility (Count Twelve)

Wexler and Zero NC bring a claim for promissory estoppel arising out of Schlage's alleged promise to renew the lease of the Burgaw facility "for decades." Am. Compl. ¶¶ 209–12. In particular, they assert that Schlage convinced Wexler to retrofit the Burgaw facility by assuring him that Schalge would lease the facility for 40 years. *Id.* ¶¶ 58–59. Wexler and Zero NC allege that when Schlage sent Wexler a draft written lease with a two-year lease term,

---

[4] In the event that the Distributor Plaintiffs *are* required to show unconscionable injury, their estoppel claim would fail on the facts alleged herein. An unconscionable injury is one "beyond that which flows naturally (expectation damages) from the non-performance of the unenforceable agreement." *Merex A.G. v. Fairchild Weston Sys., Inc.*, 29 F.3d 821, 827 (2d Cir. 1994). The Distributor Plaintiffs claim that they suffered unconscionable injury because they had to lay off employees, close offices, and cease doing business. Pls.' Mem. at 24. In the case of the Distributor Plaintiffs' businesses and relationship with Defendants, these are exactly the types of injuries they should have expected to flow from Defendants' non-performance: without continuation of their exclusive distributorship arrangements, the Distributor Plaintiffs should have expected that they would be forced out of business. Moreover, the Second Circuit has suggested that unconscionable injury does not exist where a plaintiff would have suffered the same harm regardless of the defendants' representations. *See Cacchillo v. Insmed, Inc.*, 551 F. App'x. 592, 595 (2d Cir. 2014). Here, the Distributor Plaintiffs would have been similarly forced out of business if Defendants had not promised to use them as exclusive distributors.

renewable in two-year increments, he assured Wexler that this was a standard term required by Allegion's internal policies, but that Defendants' intent of leasing the property long term was unchanged. *Id.* ¶ 61. Schlage never renewed its initial two-year lease of the Burgaw facility. *Id.* ¶ 107.

Defendants contend that Wexler and Zero NC's promissory estoppel claim is barred as a matter of law because the written lease agreement governs the same subject matter—lease duration—and courts in this district have routinely dismissed promissory estoppel claims where written contracts already govern the subject matter of the estoppel claim. Defs.' Mem. at 29. Relatedly, Defendants contend that the lease agreement's merger clause bars a promissory estoppel claim based on the same subject matter of the lease. *Id.* ¶¶ 29–30. Furthermore, they claim that even if the claim is not barred by the merger clause, Wexler and Zero NC are unable to establish a *prima facie* case of promissory estoppel, in part, because their reliance on Schalge's alleged promise was unreasonable in light of the existence of the written lease agreement. *Id.* ¶ 30.

Defendants' arguments are underpinned by their fundamental contention that Schlage's alleged promise and the Burgaw lease are related to the same "subject matter." While this argument appears reasonable at first glance, upon closer look it is evident that Schlage's alleged promise to lease the Burgaw facility "for decades" does not necessarily arise from the same subject matter as the written lease. As alleged, Schlage's promise was intended to induce, and allegedly *actually* induced, Wexler and Zero NC to invest significant resources in retrofitting the Burgaw facility *before* Schlage drafted the lease and before the parties signed the lease. Am. Compl. ¶¶ 58–59; Pls.' Mem. at 24 ("Wexler incurred the significant cost of retrofitting that property *before* any lease and in reliance on defendant's promise about long-term lease of the

property.").  Furthermore, the lease could reasonably be interpreted as dealing with short-term leasing of the facility, while the promise addressed long-term leasing, two distinct subject matters.  Relatedly, Defendants' argument that it was unreasonable for Wexler and Zero NC to rely on Schalege's oral promise because a written lease existed is unavailing because Plaintiffs' reliance occurred before the lease was drafted and finalized.  Defendants' other reliance arguments are equally unconvincing.  Accordingly, Defendants' motion to dismiss Count Twelve of the Amended Complaint is DENIED.

### F. Zero Realty's Unjust Enrichment Claim (Count Eighteen)

Count Eighteen of the Amended Complaint asserts that Zero Realty provided cleaning and maintenance services to Schlage and that Schlage was unjustly enriched when it refused to pay for these services.  Am. Compl. ¶¶ 112, 240–44.  Defendants contend that the unjust enrichment claim must be dismissed because it is wholly duplicative of Zero Realty's breach of contract claim based on the same facts and seeking the same relief.  Defs.' Mem. at 31.

"[W]here there is an enforceable written contract governing the particular subject matter, claims based on quasi-contract theories like unjust enrichment do not provide a distinct basis for recovery."  *Vitrano v. State Farm Ins. Co.*, No. 08 Civ. 00103 (JGK), 2008 WL 2696156, at *3 (S.D.N.Y. July 8, 2008); *see also Spanierman Gallery, PSP v. Love*, No. 03 Civ. 3188 (VM), 2003 WL 22480055, at *4 (S.D.N.Y. Oct. 31, 2003) ("The New York Court of Appeals has held that the 'existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.'" (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 521 N.Y.S.2d 653, 656 (N.Y. 1987))).  However, even though Zero Realty may not ultimately *recover* under both the breach of contract and unjust enrichment claims, courts in this Circuit routinely allow plaintiffs to *plead*

such claims in the alternative. *See Maalouf v. Salomon Smith Barney, Inc.*, No. 02 Civ. 4770 (SAS), 2003 WL 1858153, at *7 (S.D.N.Y. Apr. 10, 2003) (noting that plaintiff is allowed to plead both contract and quasi-contract claims even though he may only recover on one such ground); *Orange Cnty. Choppers, Inc. v. Olaes Enters., Inc.*, 497 F. Supp. 2d 541, 557 (S.D.N.Y. 2007) (citing *Maalouf* and Rule 8(a) of the Federal Rules of Civil Procedure for the principle that plaintiff may plead breach of contract and unjust enrichment claims alternatively despite defendant's contention that a valid and enforceable contract governed the dispute); *Contractual Obligation Prods., LLC v. AMC Networks, Inc.*, No. 04 Civ. 2867 (BSJ) (HBP), 2006 WL 6217754, at *7 (S.D.N.Y. Mar. 31, 2006) (observing that the argument that quasi-contract claim was barred as duplicative of contract claim was "misguided at the pleading stage"). Accordingly, the unjust enrichment claim cannot be dismissed on this basis, and Defendants' motion to dismiss Count Eighteen of the Amended Complaint is DENIED.

### G. Personal Jurisdiction over Allegion plc

Defendants contend that Plaintiffs have failed to meet their burden of establishing that the Court has personal jurisdiction over Allegion plc. Defs. Mem. at 31–39. In diversity cases, personal jurisdiction is determined in accordance with the law of the forum in which the federal court sits. *Whitaker*, 261 F.3d at 208 (2d Cir. 2001) (citing *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997)). This determination involves a two-step analysis. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). In New York, the Court must first determine whether personal jurisdiction is appropriate pursuant to the State's general jurisdiction statute, Civil Practice Law and Rules ("C.P.L.R.") § 301, or its long-arm jurisdiction statute, C.P.L.R. § 302(a). If and only if the Court's exercise of personal jurisdiction is deemed appropriate according to New York law, the second step is an evaluation of whether the Court's

exercise of personal jurisdiction comports with the Fifth Amendment Due Process Clause of the United States Constitution. *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007). Where, as here, the court does not conduct an evidentiary hearing, a plaintiff need only allege facts sufficient for a *prima facie* showing of jurisdiction. *See M. Shanken Commc'ns, Inc. v. Variant Events, LLC*, No. 10 Civ. 4747 (CM), 2010 WL 4159476, at *3 (S.D.N.Y. Oct. 7, 2010) (citing *DiStefano v. Carozzi N.A., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001)).

Plaintiffs contend that the Court may assert specific personal jurisdiction over Allegion plc pursuant to N.Y.C.P.L.R. § 302(a)(2), which provides for personal jurisdiction over a non-domiciliary who commits a tort within the state, except for defamation. Specifically, they assert that Allegion plc is subject to jurisdiction based on tortious conduct it committed in New York through Mehrotra and Bewley, who Plaintiffs allege were acting as Allegion plc's agents. Pls.' Mem. at 33–34. Defendants challenge Plaintiffs' assertion that Mehrotra and Bewley were Allegion plc's agents. Reply Mem. at 19–20.

The Court need not determine whether Plaintiffs have sufficiently plead long-arm jurisdiction because their jurisdictional argument is otherwise fundamentally flawed: they have failed to allege *any* facts demonstrating that exercising personal jurisdiction over Allegion plc would be consistent with Fifth Amendment due process. In order to defeat a motion to dismiss for lack of personal jurisdiction, in addition to making a *prima facie* showing that a New York statute allows the defendant to be haled into court, "a plaintiff must make a *prima facie* showing that . . . exercising personal jurisdiction over the defendant is consistent with due process." *Ahmed v. Purcell*, No. 14 Civ. 7491 (KPF), 2016 WL 1064610, at *6 (S.D.N.Y. Mar. 14, 2016). Instead of alleging facts supporting due process, Plaintiffs merely argue that "due process

questions based on minimum contacts and fairness concerns may not be adjudicated based merely on defendants' self-serving say-so before discovery." Pls.' Mem. at 28. While this may be the case, Plaintiffs were required, at a minimum, to allege facts supporting a determination that personal jurisdiction would not offend due process. *See, e.g., Dorchester Fin. Sec., Inc.* v. *Banco BRJ, S.A.*, 722 F.3d 81, 84–85 (2d Cir. 2013) ("Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations."); *Ahmed*, 2016 WL 1064610, at *6 ("Plaintiff has not demonstrated that exercising personal jurisdiction would be consistent with due process. As a result, Plaintiff's case must be dismissed."). Accordingly, Plaintiffs have failed to make a *prima facie* showing of jurisdiction, and Defendants' motion to dismiss all claims against Allegion plc is GRANTED.

## V.     Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. Wexler's claims for fraudulent inducement, tortious interference, and breach of contract based on the board position (Counts One, Two, and Five, respectively) are dismissed and he will not be given leave to amend his complaint a second time. Plaintiffs' claims against Allegion plc are dismissed for lack of personal jurisdiction. The parties are directed to appear for a conference on **April 24, 2018 at 10:30 a.m.** The Clerk of the Court is respectfully directed to terminate the motion, Doc. 67, Doc. 78.

It is SO ORDERED.

Dated:     March 29, 2018
           New York, New York

Edgardo Ramos, U.S.D.J.

33