UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ELIAS WEXLER, ZERO INTERNATIONAL REALTY
CO., INC., ZERO OHIO, LLC, ZERO AMERICA
LATINA, LTD., ZERO ASIA PACIFIC LTD., ZERO
EAST, LTD., 391 CONCORD AVENUE, INC., and
ZERO REALTY NC LLC,

                            Plaintiffs,

                  - against -

ALLEGION (UK) LIMITED and SCHLAGE LOCK
COMPANY, LLC,

                            Defendants.

---

SCHLAGE LOCK COMPANY, LLC,

                            Counterclaimant,

                  - against -

ELIAS WEXLER,

                            Counterclaim-Defendant.

---

**OPINION AND ORDER**

16 Civ. 2252 (ER)

Ramos, D.J.:

        Elias Wexler and various entities related to his former company, Zero International, Inc.

("Zero"), brought this action against Allegion (UK) Limited ("Allegion") and its subsidiary

Schlage Lock Company, LLC ("Schlage"), asserting a host of claims arising out of Schlage's

acquisition of Zero.  Schlage asserted various counterclaims against Wexler.  Pending before the

Court is Wexler's motion to dismiss Schlage's counterclaims for defamation and breach of a

non-disparagement clause pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons

set forth below, Wexler's motion is GRANTED in part and DENIED in part.

I.      **Factual and Procedural Background**[1]

    A.      **The Parties' Transaction**

In April 2015, Schlage purchased substantially all the assets of Wexler's company, Zero, a door, window, and hardware manufacturer.  Countercl. ¶¶ 1–2, Doc. 88.  As part of the transaction, Schlage and Allegion executed an Asset Purchased Agreement ("APA") with Wexler and Zero, and Wexler also signed a Non-Competition and Non-Solicitation Agreement (the "Non-Compete").  *Id.* ¶¶ 29, 32.  Under the APA, Schlage hired Wexler to serve as "President Emeritus" of Zero, and the Non-Compete barred Wexler from competing with Zero for five years.  *Id.* ¶¶ 30, 33.  The Non-Compete also contained a non-disparagement clause, which prohibited Wexler from directly or indirectly making any disparaging or derogatory statement about Schlage.[2]  *Id.* ¶ 35.

The relationship quickly turned sour, and Schlage fired Wexler in September 2015.  *Id.* ¶ 6.  Schlage alleges that Wexler then embarked on a campaign to compete against and harm Zero in violation of his Non-Compete by, among other things, having his son form a competing company and making defamatory and disparaging statements about Zero to the media, as discussed further below.  *Id.* ¶¶ 7, 14, 20.

---

[1] The following facts are drawn from the allegations in Schlage's Counterclaim, which the Court accepts as true for purposes of the instant motion to dismiss.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  In addition, the Court may consider "documents . . . incorporated in [the Counterclaim] by reference" and "matters of which judicial notice may be taken."  *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 123 (2d Cir. 2011) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).  The Court may take judicial notice of court filings "not for the truth of the matters asserted . . . but rather to establish the fact of such litigation and related filings."  *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

[2] The clause deemed a statement about a person disparaging or derogatory "if it adversely affects or could reasonably be expected to adversely affect the regard or esteem in which such Person is held by other Persons."  Countercl. ¶ 35.

### B.    Wexler's Complaint

On February 29, 2016, Wexler and various entities related to Zero sued Schlage and Allegion in New York state court for allegedly terminating and discriminating against him because of his age, breaching the employment provisions of the APA, breaching other contracts with Zero entities and misappropriating their services or property, and defaming him to his colleagues.[3]  Compl. ¶¶ 125–183, Doc. 97-2.  Wexler's Complaint included the following allegations:

- "Elias Wexler . . . has been robbed of his hard-earned career and reputation through Defendants' tortious and discriminatory conduct, which violated New York law and standards of professional decency."  *Id.* ¶ 1.

- "Defendants have acted dishonorably by repeatedly breaking their word and their obligations to Wexler . . . ."  *Id.* ¶ 6.

- "Defendants did not keep their word to Zero International's Canadian distributors. Defendants severed ties with these distributors, proving the rumors [that they would do so] true.  Defendants wrongfully traded on Wexler's reputation and trustworthiness to mislead the Canadian distributors into believing that their business relationships with Zero International would remain intact, when Defendants knew all along (but Wexler did not) that the industry rumors were true."  *Id.* ¶ 56.

- "Defendants falsely informed prominent members of the door and hardware, acoustics and fireproofing industries, that Wexler's work for Defendants had been unsatisfactory, and that Wexler was unworthy of continued employment.  They informed prominent members of these industries about Wexler's termination, including the humiliating details surrounding the manner in which Wexler was terminated [by] . . . being escorted from the building by security guards . . . ."  *Id.* ¶¶ 83–84.

- "Despite [an Allegion manager's] agreement to the contrary, Defendants have refused to use Zero Latina, Zero Asia and Zero East as their exclusive suppliers and distributors for Zero International products.  Defendants have bypassed Zero Latina, Zero Asia and Zero East and have sold Zero International products on their own in these markets."  *Id.* ¶ 95.

- "Defendants, through their words and conduct, made false statements about Wexler to third parties, including Defendants' employees, Wexler's former colleagues and co-

---

[3] The Complaint was removed to this Court on the basis of diversity jurisdiction on March 28, 2016.  Doc. 2.  On November 9, 2016, the Court denied Plaintiffs' motion to remand the case to state court.  Doc. 36; *Wexler v. Allegion (UK) Ltd.*, No. 16 Civ. 2252 (ER), 2016 WL 6662267, at *5 (S.D.N.Y. Nov. 9, 2016).

workers, and members of the door and hardware, acoustics and fireproofing industries." *Id.* ¶ 146.

**C.      Wexler's Press Release**

On April 5, 2016, about a month after the Complaint was filed, Wexler's then-counsel issued a press release announcing his lawsuit through the website BusinessWire.  Countercl. ¶ 130; *see* Doc. 97-4 ("Press Release").  The headline on the Press Release was "International Security Expert Elias Wexler Files Suit against Allegion, Schlage over Damage to Business and Reputation."  The Press Release stated in pertinent part:

- "Calling them predators bent on achieving their growth ambitions at the expense of the entrepreneurs who developed many of their most successful product lines, international security, fireproofing and door hardware expert Elias Wexler has filed suit against Allegion (UK) plc and Schlage Lock Company, LLC, alleging age discrimination, breach of contract, defamation, unjust enrichment and a pattern of other damaging conduct and business practices . . . ."

- "According to the complaint filed in New York State Supreme Court, Allegion acquired Zero International on April 1, 2015, making numerous commitments and assurances to Wexler in the process, including an 18-month employment contract, a promise to continue working with Wexler's companies in South America, Asia and the Middle East, the permanent title of president emeritus of Zero International and support for the continuation of his leadership roles on numerous government and industry committees and standards-setting bodies."

- "Despite hiring Wexler with great fanfare, however, in September 2015 Allegion terminated him without notice and publicly humiliated him by having him escorted from his office by security guards in front of colleagues and co-workers.  The defendants gave no explanation of Wexler's abrupt and public termination, creating the false impression that Wexler had engaged in some kind of misconduct.  They also allowed damaging rumors to circulate unchecked throughout the industry to which he had dedicated his entire professional life.  As a result, the suit says, Wexler suffered irreparable damage to his reputation, was asked to step down from several prominent industry positions and is no longer invited to speak as an expert in his field, the complaint says."

- "'The damage my family and I have suffered as a result of Allegion's dishonesty and shameful acquisition practices goes well beyond financial harm,' Wexler said.  'To have built a reputation over more than 35 years only to have it destroyed by an organization that acquires small companies with the intention of capitalizing on their valuable intellectual property and then casting aside and discrediting the dedicated individuals who created it – that is a loss no amount of money can compensate.'"

The final line of the Press Release provided a link to a copy of Wexler's Complaint.

**D.     The *Crain's* Article**

On December 12, 2016, *Crain's New York Business* reported that Schlage planned to shut down its Bronx facility where Zero operated and move those operations to Indianapolis. Countercl. ¶ 141; *see* Doc. 97-5 ("Article").  The Article ran with the headline "New owner to shut down Bronx factory, move jobs to Indiana," and the subheading "Allegion broke promise to keep warehouse open, says former owner of Zero International, a 92-year-old maker of fireproof doors and hinges."  The Article opened with a sentence about Zero's history in the Bronx since World War II and continued:

- "This week that history comes to an end.  A new owner will shut the factory's two buildings, lay off 58 workers and move the company to Indiana.  It wasn't supposed to be this way."

- "'It hurts,' said Elias Wexler, who owned the sealing-systems manufacturer for three decades before selling it to security-solutions provider Allegion in April 2015 for more than $20 million.  'The bottom line is that people who worked for me for 30 years are out of a job this Christmas [because of] false promises.'" (alteration in original)

- "Wexler said he sold Zero, which was founded by Hungarian immigrants in 1924, after Allegion promised to keep the company in the Bronx.  To help make that possible, Wexler leased Allegion the Concord Avenue buildings, which he owns, for about $5 per square foot, or half the market rate.  Wexler, a Romanian immigrant who started at Zero as an engineer in the late 1970s, also said Allegion agreed to name him president emeritus for life and keep him as an adviser."

- "Now 66, he held the emeritus position until September 2015, when he was fired and escorted from the building, according to a breach of contract suit he filed in New York State Supreme Court in April 2016."

- "'If I would have smelled they were lying, I wouldn't have sold it,' Wexler said."

The Article went on to describe the economic conditions at Zero and other companies that moved out of state.

E.        Wexler's Amended Complaint

On March 9, 2017, the Court granted in part and denied in part Defendants' motion to dismiss the Complaint, dismissing Plaintiffs' claims for age discrimination and breach of contracts with Zero distributors, but granting leave to replead those claims.[4]  Doc. 46; *Wexler v. Allegion (UK) Ltd.*, No. 16 Civ. 2252 (ER), 2017 WL 946301, at *7 (S.D.N.Y. Mar. 9, 2017).

On April 28, 2017, about four-and-a-half months after the Article was published, Wexler filed an Amended Complaint, dropping his claims for age discrimination and breach of his employment contract, and adding claims for fraudulent inducement, tortious interference, and promissory estoppel.  Am. Compl. ¶¶ 129–243, Docs. 52, 97-3.  The Amended Complaint included several new allegations that were not in the original Complaint, including the following:

- "Defendants never intended to honor the collateral agreements and promises they made to induce Wexler to enter the APA."  *Id.* ¶ 69.

- "[Allegion managers] told Wexler that Allegion/Schlage intended to keep Zero's current workforce in the Bronx, Ohio and North Carolina [among other assurances].  None of these statements is true.  They were not true then, and they are not true now."  *Id.* ¶¶ 71(b), 72.

- "At the same time as defendants were attacking Wexler's business reputation and character, they systematically breached ancillary agreements with him and his other Zero companies . . . ."  *Id.* ¶ 104.

On March 30, 2018, the Court granted in part and denied in part Defendants' motion to dismiss the Amended Complaint, dismissing Wexler's claims for fraudulent inducement, tortious interference, and breach of an agreement to appoint Wexler to Allegion's board of directors, such that the remaining claims assert defamation, breach of agreements with Zero entities, promissory

---

[4] Plaintiffs also withdrew their conversion claim.  *Wexler*, 2017 WL 946301, at *7.

estoppel, and unjust enrichment.[5]  Doc. 87; *Wexler v. Allegion (UK) Ltd.*, No. 16 Civ. 2252 (ER), 2018 WL 1626346, at *16 (S.D.N.Y. Mar. 30, 2018).

### F.    Schlage's Counterclaim

On April 13, 2018, Defendants answered the Amended Complaint, and Schlage asserted counterclaims against Wexler for conversion, defamation, breach of the Non-Compete including the non-disparagement clause, breach of the APA, and misrepresentation.[6]  Countercl. ¶¶ 159– 196.  Wexler now moves to dismiss Schlage's counterclaims for defamation and breach of the non-disparagement clause for failure to state a claim under Rule 12(b)(6).  Doc. 95.

## II.    Legal Standard

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the counterclaim as true and draw all reasonable inferences in the counterclaimant's favor.  *See Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011). However, the Court is not required to credit legal conclusions, bare assertions, or conclusory allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681, 686 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a [counterclaim] must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible when the counterclaimant "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The counterclaimant must allege sufficient facts to show "more than a sheer possibility that a

---

[5] The Court also dismissed Allegion's parent company, Allegion plc, for lack of personal jurisdiction. *Wexler*, 2018 WL 1626346, at *16.

[6] On May 22, 2018, Schlage withdrew its claim for breach of the APA provision requiring Wexler to change the names of certain Zero entities.  Doc. 92.

defendant has acted unlawfully." *Id.* If the counterclaimant has not "nudged [its] claims . . . across the line from conceivable to plausible," the counterclaim must be dismissed. *Id.* at 680 (quoting *Twombly*, 550 U.S. at 570).

## III. Discussion

Wexler argues that Schlage's defamation claim fails as a matter of law because both the Press Release and the Article are privileged as "fair and true report[s] of [a] judicial proceeding." N.Y. Civ. Rights Law § 74. Wexler further argues that because they are privileged, they also cannot give rise to liability for breach of the non-disparagement clause. Schlage responds that neither the Press Release nor the Article are privileged, and even if they were immune from defamation liability, they would separately constitute actionable breaches of the non-disparagement clause. The Court will first address whether either the Press Release or the Article are privileged against defamation claims, and then will determine whether any such privileged statements may nonetheless give rise to contractual liability for breach of the non-disparagement clause.

### A. Defamation

"Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012) (quoting *Idema v. Wager*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000), *aff'd*, 29 F. App'x 676 (2d Cir. 2002)). Under New York law, a defamation claim must allege "(1) a false statement about the [complainant]; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'"[7] *Fuji Photo Film U.S.A.,*

---

[7] "A statement is *per se* defamatory when it 'tend[s] to injure another in his or her trade, business or profession.'" *ABKCO Music, Inc. v. Sagan*, No. 15 Civ. 4025 (ER), 2016 WL 2642224, at *3 n.4

*Inc. v. McNulty*, 669 F. Supp. 2d 405, 411 (S.D.N.Y. 2009) (alterations in original) (quoting

*Gargiulo v. Forster & Garbus Esqs.*, 651 F. Supp. 2d 188, 192 (S.D.N.Y. 2009)).

A defamatory statement "exposes an individual 'to public hatred, shame, obloquy,

contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . .

induce[s] an evil opinion of one in the minds of right-thinking persons, and . . . deprives one of

. . . confidence and friendly intercourse in society.'"  *Celle v. Filipino Reporter Enters. Inc.*, 209

F.3d 163, 177 (2d Cir. 2000) (alteration in original) (quoting *Kimmerle v. N.Y. Evening Journal*,

186 N.E. 217, 218 (N.Y. 1933)).  On a motion to dismiss a defamation claim, the court must

decide whether the alleged statements are "reasonably susceptible" to defamatory meaning.

*Dworin v. Deutsch*, No. 06 Civ. 13265 (PKC), 2008 WL 508019, at *3 (S.D.N.Y. Feb. 22, 2008).

"A statement is not defamatory if it is privileged or authorized."  *ABKCO Music, Inc. v.

Sagan*, No. 15 Civ. 4025 (ER), 2016 WL 2642224, at *3 (S.D.N.Y. May 6, 2016).  Section 74 of

the New York Civil Rights Law provides in pertinent part that a privilege exists for "the

publication of a fair and true report of any judicial proceeding."  N.Y. Civ. Rights Law § 74.

"The purpose of the statute in part is to implement the public policy in favor of encouraging

publication and dissemination of judicial decisions and proceedings as being in the public

interest."  *Beary v. W. Publ'g Co.*, 763 F.2d 66, 68 (2d Cir. 1985).  "[T]he statute confers an

absolute immunity, regardless of proof of malice or negligence, upon any person who publishes a

'fair and true report' of a judicial [proceeding]."  *Id.*  This includes statements published not only

by the media, but also by parties or their counsel.  *Procter & Gamble Co. v. Quality King

Distribs., Inc.*, 974 F. Supp. 190, 197 (E.D.N.Y. 1997); *Fishof v. Abady*, 720 N.Y.S.2d 505, 506

---

(S.D.N.Y. May 6, 2016) (alteration in original) (quoting *Stern v. Cosby*, 645 F. Supp. 2d 258, 273
(S.D.N.Y. 2009)).

(App. Div. 1st Dep't 2001).  Thus, "[o]ut-of-court statements such as press releases . . . are privileged only to the extent that they represent fair and true reports of what occurred in the proceeding."  *Long v. Marubeni Am. Corp.*, 406 F. Supp. 2d 285, 294 (S.D.N.Y. 2005).

"For a report to be characterized as 'fair and true' within the meaning of the statute, thus immunizing its publisher from a civil suit sounding in libel, it is enough that the substance of the article be substantially accurate."  *Holy Spirit Ass'n for the Unification of World Christianity v. N.Y. Times Co.*, 399 N.E.2d 1185, 1187 (N.Y. 1979).  "The report is not required to use the same words as the pleadings to convey the substance of the judicial proceeding and '[t]he challenged language . . . should not be dissected and analyzed with a lexicographer's precision.'"  *D'Annunzio v. Ayken, Inc.*, 876 F. Supp. 2d 211, 217 (E.D.N.Y. 2012) (alteration in original) (quoting *Idema*, 120 F. Supp. 2d at 369).  "It is sufficient that the plaintiff's complaint or documents referred to therein form the basis for each of the contested statements," *id.* at 217–18, or that the statements "essentially summarize or restate the allegations of the complaint," *McRedmond v. Sutton Place Rest. & Bar, Inc.*, 851 N.Y.S.2d 478, 479 (App. Div. 1st Dep't 2008).  In addition, privileged statements "extend[] to the release of background material with regard to the case, so long as the statement is a substantially accurate description of the allegation."  *Fishof*, 720 N.Y.S.2d at 506 (citation omitted).

A report is not "substantially accurate," however, "if it would have a 'different effect' on the mind of the recipient than the 'actual truth.'"  *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 119 (2d Cir. 2005) (quoting *Calvin Klein Trademark Tr. v. Wachner*, 129 F. Supp. 2d 248, 253 (S.D.N.Y. 2001)).  "In other words, Section 74 does not afford protection if the specific statements at issue, considered in their context, 'suggest[] more serious conduct than that actually suggested in the official proceeding.'"  *Id.* (alteration in original) (quoting *Calvin Klein*,

129 F. Supp. 2d at 253).  Similarly, a report is not "fair and true" if it "transform[s] allegations . . . into fact."  *Pisani v. Staten Island Univ. Hosp.*, 440 F. Supp. 2d 168, 178 (E.D.N.Y. 2006) (emphases omitted).

In addition, "[s]ection 74 applies only where the challenged report is 'of' a proceeding." *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 216 (N.D.N.Y. 2014).  The contested statement must be "connected to a judicial proceeding," *Wenz v. Becker*, 948 F. Supp. 319, 322 (S.D.N.Y. 1996), such that "the ordinary viewer or reader [is] able to determine from the publication itself that the publication is reporting on the proceeding," *Fine*, 11 F. Supp. 3d at 216.

"It is for the Court to determine as a matter of law if a publication is a 'fair and true' report under section 74, unless the Court determines that an issue of fact remains."  *Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*, No. 06 Civ. 11407 (BSJ), 2007 WL 4820968, at *3 (S.D.N.Y. Sept. 18, 2007).  "In the latter instance, the question becomes one for the jury."  *Id.*  If there are no issues of fact and the only issue is "whether the undisputed content of the [statement] qualifies as a 'fair and true report' of the undisputed content of the [pleading], the Court can resolve the dispute as a matter of law" on a motion to dismiss.  *ABKCO*, 2016 WL 2642224, at *4.

### 1.     The Press Release

Schlage takes issue with three statements in the Press Release:  (1) Wexler called Schlage and Allegion "predators bent on achieving their growth ambitions at the expense of . . . entrepreneurs"; (2) Wexler was harmed by Allegion's "dishonesty and shameful acquisition practices"; and (3) Schlage or Allegion "acquires small companies with the intention of capitalizing on their valuable intellectual property and then casting aside and discrediting the dedicated individuals who created it."

While the Court does not condone the rhetorical hyperbole in the Press Release, the Court cannot say that it "suggest[s] more serious conduct" than what is alleged in Wexler's Complaint. *Karedes*, 423 F.3d at 119 (quoting *Calvin Klein*, 129 F. Supp. 2d at 253).  Rather, the Press Release "essentially summarize[s] or restate[s] the allegations of the complaint."  *McRedmond*, 851 N.Y.S.2d at 479.  The Complaint alleges that Schlage and Allegion "violated . . . standards of professional decency"; "acted dishonorably by repeatedly breaking their word," including promises to maintain ties to companies related to Zero after acquiring it; and "robbed" Wexler of his career and reputation by spreading falsehoods about him.  Compl. ¶¶ 1, 6, 83, 95.  These allegations are essentially restated in the Press Release's comments that Schlage and Allegion were "dishonest[] and shameful" "predators" who acquired companies to capitalize on their property and then "cast[] aside and discredit[]" their original creators.  Moreover, because the Press Release repeatedly references the lawsuit—in the headline announcing its filing, throughout the body, and at the end with a link to the Complaint—it is clear that the Press Release reports on allegations made in the Complaint, rather than presenting them as established facts.  Accordingly, the Press Release is privileged under section 74.[8]

---

[8] Schlage argues that Wexler is not entitled to the protection of section 74 under the exception denying protection to persons who "maliciously institute a judicial proceeding alleging false and defamatory charges, and . . . then circulate a press release or other communication based thereon."  *Williams v. Williams*, 246 N.E.2d 333, 337 (N.Y. 1969).  However, "[t]he *Williams* exception is narrow" and cannot apply "in the absence of any allegation that the . . . action was brought maliciously and solely for the purpose of later defaming the [complainant]."  *Fuji Photo*, 669 F. Supp. 2d at 412 (quoting *Riel v. Morgan Stanley*, No. 06 Civ. 524 (TPG), 2007 WL 541955, at *12 (S.D.N.Y. Feb. 16, 2007), *aff'd*, 299 F. App'x 91 (2d Cir. 2008)).  Because Schlage "fails to allege that [Wexler] filed [his] Complaint maliciously and for the sole purpose of defaming" Schlage, its counterclaim "is insufficient to invoke the *Williams* exception to the section 74 privilege."  *Id.* at 415.  In any event, the record belies the notion that Wexler brought this action "maliciously and for the sole purpose of defaming" Schlage.  Plaintiffs have plausibly alleged multiple claims, as the Court granted the motion to dismiss the Complaint only in part, with leave to replead, *Wexler*, 2017 WL 946301, at *7, and again granted the motion to dismiss the Amended Complaint only in part, upholding numerous claims, *Wexler*, 2018 WL 1626346, at *16.  Moreover, although Defendants have twice moved to dismiss the Complaint and Amended Complaint, they have never moved to strike from those pleadings any "scandalous matter," Fed. R. Civ. P. 12(f), or

###### 2.      The Article

The Article in *Crain's* presents a closer question.  Schlage attacks the following statements in the Article:  (1) Wexler's quote that "people who worked for me for 30 years are out of a job this Christmas [because of] false promises" (alteration in original); (2) Wexler's quote that "[i]f I would have smelled they were lying, I wouldn't have sold it"; and (3) the statement attributed to Wexler that he sold Zero after "Allegion promised to keep the company in the Bronx."  Schlage contends that it never made such a promise, rendering the statements concerning a broken promise false and defamatory.  Countercl. ¶ 143.

Schlage argues that "the context in which the statements are made make it impossible for the ordinary [reader] to determine whether [the person making the statements] was reporting on a judicial proceeding," rendering the privilege inapplicable.  *Greenberg v. Spitzer*, 62 N.Y.S.3d 372, 384 (App. Div. 2d Dep't 2017) (quoting *Cholowsky v. Civiletti*, 887 N.Y.S.2d 592, 596 (App. Div. 2d Dep't 2009)); *see also Corp. Training Unlimited, Inc. v. Nat'l Broad. Co.*, 868 F. Supp. 501, 509 n.6 (E.D.N.Y. 1994) (holding that the privilege does not apply where the ordinary viewer cannot determine whether the defendant was "reporting on a trial or simply from interviews and independent research").  "If context indicates that a challenged portion of a publication focuses exclusively on underlying events, rather than an official proceeding relating to those events, that portion is insufficiently connected to the proceeding to constitute a report of that proceeding."  *Fine*, 11 F. Supp. 3d at 217.

Here, the thrust of the Article, as stated in the headline and subheadline, is the underlying events—a "[n]ew owner [was] to shut down Bronx factory" and "Allegion broke promise to keep

---

for sanctions for presenting those pleadings for "any improper purpose, such as to harass," Fed. R. Civ. P. 11(b)(1).

warehouse open."  Wexler's challenged statements likewise focus on those underlying events—Allegion's "false promises" and "lying."  In the fourth paragraph, the Article does reference Wexler's lawsuit, stating that Wexler "was fired and escorted from the building, according to a breach of contract suit he filed in New York State Supreme Court in April 2016."  "However, a report's mere mention of an official proceeding does not automatically extend the privilege to an entire publication . . . ."  *Fine*, 11 F. Supp. 3d at 217; *see also Corp. Training*, 868 F. Supp. at 509 (no privilege where references to court proceedings occurred "mostly in passing and only towards the end" of the segment).  The Article does not describe the allegations in the lawsuit other than Wexler's being fired and escorted from the building.  It is unclear from the context whether Wexler's breach-of-contract suit was over Allegion's firing him and breaching an "agree[ment] to name him president emeritus for life and keep him as an adviser" (as stated in the preceding sentence), or breaking the promise to keep the Bronx factory open that is the thrust of the Article.  As such, it is equally unclear whether Wexler's statements about the broken promise were reporting on the allegations in his lawsuit or making an independent accusation against Allegion.  Accordingly, the Court cannot determine as a matter of law that Wexler's statements in the Article were a privileged report of his lawsuit, and this portion of the motion must be denied.  *See Wenz*, 948 F. Supp. at 323–24 (holding that there was a factual issue as to whether the defendant's statement in an article reported on a judicial proceeding where (1) the focus of the article was not the lawsuit; (2) the statement preceded the sentences describing the lawsuit, raising a factual question as to whether the defendant was discussing the lawsuit or issuing independent comments; and (3) the article did not include language indicating that the statement related to the lawsuit).[9]

---

[9] Because the Court cannot determine as a matter of law that Wexler's statements in the Article reported on his lawsuit at all, let alone constituted a "fair and true" report, the Court need not decide whether his

B.      **Breach of the Non-Disparagement Clause**

Having determined that only the Press Release is privileged and not defamatory as a matter of law under section 74, the Court next considers whether the Press Release can nonetheless constitute a breach of Wexler's non-disparagement clause.

Although the parties have not identified any cases construing section 74 in the context of a claim for breach of a non-disparagement clause, New York courts have held that a related privilege—the absolute privilege for witnesses' statements in a judicial proceeding—bars claims for breach of a non-disparagement clause based on such statements. *Arts4All, Ltd. v. Hancock*, 773 N.Y.S.2d 348, 351 (App. Div. 1st Dep't 2004). The Appellate Division has also contrasted absolute privileges with qualified privileges in holding that a qualified privilege—for communications between persons sharing a common interest—does not bar a claim for breach of a non-disparagement clause, because "[a]n absolute privilege protects a greater public interest than a qualified privilege." *Wolberg v. IAI N. Am., Inc.*, 77 N.Y.S.3d 348, 351 (App. Div. 1st Dep't 2018). Because section 74 confers an absolute privilege, *Beary*, 763 F.2d at 68, the Court concludes that statements privileged by section 74 may not create liability for breach of a non-disparagement clause, *cf. Arts4All*, 773 N.Y.S.2d at 351. This is consistent with the text of section 74, which provides that "[a] civil action cannot be maintained" based on privileged

---

statement that Allegion broke a promise to stay in the Bronx was privileged as "background material" on his Complaint, *Fishof*, 720 N.Y.S.2d at 506, or because he "ultimately took [his] publicly stated position" in his Amended Complaint, *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 95 (2d Cir. 2017) (citing *Hudson v. Goldman Sachs & Co.*, 757 N.Y.S.2d 541, 542 (App. Div. 1st Dep't 2003)).

statements—regardless of whether that civil action is for defamation or breach of contract.[10]

N.Y. Civ. Rights Law § 74.

Accordingly, because the Press Release is privileged under section 74, the Press Release does not give rise to liability for either defamation or breach of the non-disparagement clause.[11]

## IV.   Conclusion

Wexler's motion to dismiss is GRANTED insofar as Schlage's counterclaims for defamation and breach of the non-disparagement clause are based on the Press Release. Wexler's motion is DENIED insofar as those counterclaims are based on the Article.  The Clerk of the Court is respectfully directed to terminate the motions, Docs. 95, 98.[12]

It is SO ORDERED.

Dated:     March 19, 2019
           New York, New York

                                                    _____
                                                    Edgardo Ramos, U.S.D.J.

---

[10] Although section 74's heading is titled "Privileges in action for libel," N.Y. Civ. Rights Law § 74, "section headings cannot limit the plain meaning of a statutory text," *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018).

[11] Relatedly, Schlage argues that Wexler contractually waived the protections of section 74 through the non-disparagement clause. "New York courts allow waivers of statutory rights only when: 1.) such a waiver constituted an 'intentional relinquishment of a known right,' and 2.) the waiver would not contravene public policy." *Massey v. On-Site Manager, Inc.*, No. 11 Civ. 2612 (BMC), 2011 WL 4356380, at *3 (E.D.N.Y. Sept. 16, 2011) (citation omitted).  Such a waiver must be "clear, unmistakable and without ambiguity." *County of Erie v. State*, 785 N.Y.S.2d 130, 134 (App. Div. 3d Dep't 2004) (quoting *Civil Serv. Emps. Ass'n, Inc. v. Newman*, 450 N.Y.S.2d 901, 903 (App. Div. 3d Dep't 1982), *aff'd mem.*, 463 N.E.2d 1231 (N.Y. 1984)).  Here, the non-disparagement clause contains no mention of section 74 or the privilege for fair and true reports of judicial proceedings.  Accordingly, the Court cannot conclude that Wexler waived this privilege.

[12] The request for oral argument on the motion is DENIED as moot.