UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELIAS WEXLER, ZERO INTERNATIONAL
REALTY CO., INC., ZERO OHIO, LLC, ZERO
REALTY NC, LLC, 391 CONCORD AVENUE,
INC, ZERO AMERICA LATINA, LTD., ZERO
ASIA PACIFIC, LTD., and ZERO EAST, LTD.,

                                    Plaintiffs,

                - against -

ALLEGION (UK) LIMITED, ALLEGION PLC, and
SCHLAGE LOCK COMPANY LLC,

                                    Defendants.

SCHLAGE LOCK COMPANY, LLC,

                                    Counterclaimant,

                - against -

ELIAS WEXLER,

                                    Counterclaim Defendant.

SCHLAGE LOCK COMPANY, LLC,

                                    Plaintiff,

                - against -

JACOB WEXLER, and LEGACY
MANUFACTURING LLC,

                                    Defendants.

**OPINION AND ORDER**

16 Civ. 2252 (ER)

18 Civ. 4033 (ER)

Ramos, D.J.:

Elias Wexler and entities related to his former company, Zero International, Inc. ("Zero") (collectively, "Plaintiffs") filed suit against Allegion (UK) ("Allegion") and its subsidiary Schlage Lock Company (collectively, "Schlage") for claims related to Defendants' purchase of Zero and Wexler's ensuing termination.  In response, Schlage brought several counterclaims against Wexler and its own lawsuit against Wexler's son, Jacob Wexler, as well as his company Legacy Manufacturing, LLC ("Legacy") (collectively, the "Legacy Defendants"), which was later consolidated with Plaintiffs' action.  Pending before this Court are two discovery motions by Plaintiffs and the Legacy Defendants (collectively, "Movants"):  one to compel Schlage to respond to several of their discovery requests, Doc. 129, and the other for a protective order shielding them from several of Schlage's requests, Doc. 132.  For the reasons set forth below, both motions are granted in part and denied in part.[1]

## I.      Factual Background and Procedural History[2]

This case arises from Wexler's sale of Zero to Schlage and the subsequent falling out between the parties to that sale, all of whom have brought claims in this and related actions.  The operative allegations in each action, and the discovery disputes they have generated, are described below.

### A.      The Amended Complaint

Wexler is an engineer who worked for over 35 years in the door and hardware, acoustics and fireproofing industries and became renowned for his expertise, gaining

---

[1] The corresponding letter motions for oral argument on each motion are also denied as moot.  Docs. 135; 136; 158.

[2] Unless otherwise noted, all citations to the record are to documents filed on the 16 Civ. 2252 docket.

leadership roles in several professional organizations, winning awards, and teaching. Doc. 52 at ¶¶ 3, 36-38.  In the 1970s, Wexler began working for Zero, a Bronx-based door/window seal and weatherstripping manufacturer.  *Id*. at ¶¶ 1, 31.  By 1985, Wexler bought Zero, and, through his efforts over the ensuing years, Zero products became the gold standard for door and window seals and fixtures.  *Id*. at ¶¶ 31-32.  Though Zero maintained its headquarters in the Bronx and employed numerous local workers, under Wexler's leadership, Zero expanded to four U.S. factories including in Ohio and North Carolina, and grew a sales presence throughout the U.S. and in thirty-five countries worldwide.  *Id*. at ¶ 35.

At some time in 2014, Wexler was approached by Allegion Vice President Anshu Mehrotra to sell Zero.  *Id*. at ¶¶ 6, 40-41.  Allegion is a security hardware company based in the United Kingdom.  *Id.* at ¶ 1.  Mehrotra assured Wexler that he intended for Zero to continue to flourish alongside Allegion's subsidiary, Schlage, and to preserve Zero's American manufacturing arm.  *Id*. at ¶¶ 41-42.  Mehrotra also promised that Wexler would have an "emeritus" role and continue to be a leading figure in the industry after the sale.  *Id*. at ¶¶ 43-44.

On February 19, 2015, Wexler and Schlage executed an asset purchase agreement ("APA") governing the sale of Zero.  *Id*. at ¶ 48.  Under the APA, Schlage would manufacture and sell Zero products through a Schlage subsidiary called Zero Group International ("Zero International").  *Id*. at ¶ 49.  As part of the deal, Wexler, his wife, and his son Jacob all entered employment agreements with Allegion.  *Id*. at ¶ 51.  Wexler also entered a non-competition agreement that prohibited him from competing with Zero International for five years.  *Id*.

Following the sale, Wexler was given the role of President Emeritus and promised at least eighteen months of employment with the expectation, however, that his engagement would last until his retirement.  *Id.* at ¶ 52.  Wexler, his wife and his son Jacob were fired by Zero International on September 17, 2015.  *Id.* at ¶¶ 86-87.  By late 2016, Schlage had fired almost all of Zero's long-time employees and had moved the headquarters from the Bronx to Indiana.  *Id.* at ¶ 89.

According to Wexler, Schlage told industry insiders and Wexler's former colleagues that he had been fired for cause.  *Id.* at ¶¶ 93-94.  Meanwhile, Wexler contends that Schlage had never complained of his work performance.  *Id.* at ¶ 95.  In December 2016, Wayne Bewley, an Allegion product manager, circulated a marketing bulletin ("Marketing Bulletin") to customers and others in the industry that called into question the quality of Zero's products.  *Id.* at ¶¶ 6, 97-98.  The Marketing Bulletin stated, in relevant part,

> During the transition of Zero International from the Bronx to our Indianapolis facility . . . we discovered several challenges and quality issues with the Zero product that needed to be corrected.  One challenge in particular was that the old Zero management saw the catalog as an easy means of testing the market for products that we at Allegion would call 'Engineered Specials.' . . . To address these concerns and in order to provide high quality products, we have been forced to place some of the products on production hold while improved solutions are identified . . ."

*Id.* at ¶ 99; Doc. 131-13 at WEXLER-0036099.

In addition, other parts of the deal began to fall through.  For example, Schlage had agreed to assume the contracts Zero had already established with its overseas distributors, Zero Asia, Zero East, and Zero Latina.  Doc. 55 at ¶¶ 64, 66.  According to alleged oral agreements, each entity was to remain the exclusive

distributor for Zero products in its region.[3]  *Id.* at ¶¶ 66, 76-79.  In 2016, however, Schlage refused to use these distributors.  *Id.* at ¶ 118.  Schlage had also entered two-year renewable leases with Zero Realty, Concord, Zero Ohio, and Zero NC for use of facilities Zero had already occupied.  *Id.* at ¶¶ 55-56.  Despite the short terms, Bewley had assured Wexler these relationships were intended to last for years to come.  *Id.* at ¶ 56.  The leases included provisions prohibiting damaging the property and requiring reversal of any alterations.  *Id.* at ¶ 57.  However, Schlage declined to renew the leases at the end of the first two-year term in March of 2017 and did not perform necessary repairs.  *Id.* at ¶¶ 107-08.

Plaintiffs allege that, as a result of these wrongs, they are entitled to upwards of $45 million in damages.  *Id.* at p. 51.

**B.      Schlage's Counterclaims and Claims against the Legacy Defendants**

Schlage alleges that, prior to entering the APA, Wexler had misrepresented his relationship with Deltrex, a manufacturer of products for commercial doors.  Doc. 88 at ¶¶ 39, 42.  While Wexler represented that he had no relationship with Deltrex and that it was Jacob's company, following his termination from Schlage, Wexler became its CEO. *Id.* at ¶¶ 40, 48.

Wexler and his son Jacob entered agreements as conditions of their employment at Zero International that prohibited competition.  *Id.* at ¶¶ 3, 5.  Wexler's agreement forbade him from competing with Zero International for five years by, *inter alia*, soliciting customers of Zero International for marketing or selling Zero products, inducing Zero International employees to leave, or representing anyone engaging in these

---

[3] According to Movants, Kazi Khozema, the General Manager of Zero East and Kentaro Muto, the President of Zero Asia, were involved in these negotiations.  *Id.* at ¶¶ 76, 78; Doc. 130 at 20-21.

activities.  *Id.* at ¶ 34.  It also contained a non-disparagement clause prohibiting Wexler from making negative statements about Schlage.  *Id.* at ¶ 35.  Jacob's agreement similarly restricted him from competing against Schlage for one year. *Id.* at ¶ 38.

After they were both terminated in September 2015, Wexler and Jacob enacted a plan to rebuild Zero.  *Id.* at ¶ 54.  In the year after his termination, Jacob worked at AAA Architectural Hardware until his non-competition agreement expired.  18 Civ. 4033 Doc. 1 at ¶ 75.  That same year, Wexler allegedly admitted to working with former Zero customers in emails with Lauren Manufacturing.  Doc. 88 at ¶¶ 58-62.

On November 10, 2016, immediately after the term of Jacob's non-competition agreement elapsed, Wexler and his son formed Legacy.  *Id.* at ¶¶ 84-85.  Though Jacob is represented as the head of Legacy, Schlage alleges that Wexler's expertise is behind all of Legacy's operations in violation of his non-competition agreement with Schlage.  *Id.* at ¶ 55.  Legacy sells products similar to those of Zero International.  *Id.* at ¶¶ 98-128.

On December 12, 2016, Crain's New York Business ran an article regarding closure of the Bronx Zero International factory in which Wexler is quoted as saying "'the bottom line is that people who worked for me for 30 years are out of a job this Christmas [because of] false promises'" and "'if I would have smelled they were lying, I wouldn't have sold it.'"  ("Crain's Article").  *Id.* at ¶¶ 141-42.  The Crain's Article also notes that "'Wexler said he sold Zero . . . after Allegion promised to keep the company in the Bronx.'"  *Id.* at ¶ 142.  Schlage pleads that Wexler's comment violates the non-disparagement clause of his employment agreement.  *Id.* at ¶ 146.

### C.      Procedural History

On February 29, 2016, Plaintiffs brought suit in the Supreme Court, Bronx County against Schlage for age discrimination under the New York State and City Human Rights Laws, defamation, breach of several contracts, unjust enrichment, and conversion (the "Wexler Action").  Doc. 2-2.  Schlage then removed the case to federal court on March 28, 2016 and, on November 9, 2016, the Court denied Plaintiffs' motion for remand.  Docs. 2; 36.  On March 9, 2017, the Court denied in part and granted in part Schlage's motion to dismiss the complaint, dispensing with the age discrimination claims and the breach of contract claims relating to Schlage's relationships with distributors with leave to replead.  Doc. 46 at 16.  Plaintiffs subsequently filed the amended complaint against Schlage and Allegion plc on April 28, 2017, this time alleging fraudulent inducement, tortious interference, defamation, breach of several contracts, promissory estoppel, and unjust enrichment.  Doc. 52.  On March 30, 2018, following a motion to dismiss by Schlage and Allegion plc, the Court dismissed the fraudulent inducement and tortious interference claims, the breach of contract claim related to the promise of an honorary board position, and all claims against Allegion plc for lack of personal jurisdiction.  Doc. 87.

On April 13, 2018, Schlage answered and brought counterclaims against Wexler for conversion, defamation, breach of the non-disparagement and other restrictive covenants of his employment agreement, breach of the APA name change provision, and misrepresentation of his role at Deltrex.  Doc. 88.  Separately, on May 4, 2018, Schlage filed a complaint against the Legacy Defendants for tortious interference and civil conspiracy (the "Legacy Action").  18 Civ. 4033 Doc. 1.  On August 10, 2018, the Court

entered a stipulation between the parties consolidating the Wexler and Legacy Actions.

Doc. 103.  On March 19, 2019, the Court granted in part Wexler's motion to dismiss,

narrowing Schlage's counterclaims for defamation and violation of the non-

disparagement clause to the Crain's Article.  Doc. 117.

### D.      Discovery Disputes and Motions

Document discovery concluded on April 22, 2019 following several rounds of

initial disclosures, document demands, and interrogatories.[4]  Doc. 134 at ¶ 27.  By then,

Movants had produced over 21,000 documents totaling more than 53,800 pages in

response to over three hundred document requests by Schlage and had incurred upwards

of $400,000 in discovery costs.  Doc. 134 at ¶¶ 4, 16, 22, 33, 54.  For its part, Schlage

had produced 4,027 documents totaling 15,550 pages in response to Movants' demands.

*Id.* at ¶ 34.

Following completion of document discovery, Movants served Schlage with

deposition notices on May 31, 2019.  *Id.* at 35.  Schlage responded on June 6, 2019 by

serving Plaintiffs with a deficiency letter, as well as 45 additional document requests in

the Wexler Action and serving the Legacy Defendants with 21 additional document

requests in the Legacy Action (collectively, "Additional Requests").  *Id.* at ¶¶ 36-39.

Among the Additional Requests, Schlage asked for documents related to Paul Popov,

Tim McCartney, and a company named Legacy Rubber.  Docs. 134-10; 134-11.

These Additional Requests were born of Schlage counsel's discovery that Popov

and McCartney might be aliases used by Wexler to engage in competitive business before

his non-competition agreement expired.  Specifically, in late February 2019, Schlage's

---

[4] In their initial disclosures, Schlage identified Dave Crocco as someone with knowledge of Wexler's
involvement with Legacy, and Jeff Weinstein as an individual with information on Legacy's
communications with Mayflower Sales Co. and Wexler's involvement at Legacy.  Doc. 131-3 at 6-7.

counsel had been informed by former Legacy employee Daemion Cameron that Wexler used the alias "Paul Popov" when he worked with customers during day to day operations at Legacy.  Docs. 146 at ¶ 2; 147 at ¶¶ 3, 11.  At that time, Schlage counsel Robin Koshy reviewed the Legacy website and confirmed that the photograph associated with Popov's name on the website belonged to another individual unrelated to any of the parties here.  Doc. 147 at ¶ 3.  After receiving Movants' final production on April 22, 2019, Schlage's counsel reviewed it for documents related to Popov and, finding none, Koshy re-reviewed the Legacy website.  *Id.* at ¶ 9.  This time, Popov's name had been removed, but his purported picture had been transferred to another supposed employee, Tim McCartney, who had an email address at Legacy Rubber.  *Id.*  When Koshy checked Movants' production, he determined that Movants had not produced documents relating to McCartney either.  *Id.* at ¶ 10.  The Legacy website also indicated that the company was expanding to manufacture rubber extrusions through Legacy Rubber, which operated out of the same office as Legacy, and manufactured products at an Ohio property owned by Wexler.  *Id.* at ¶ 11.

On June 19, 2019, Movants served their own deficiency letter on Schlage noting several deficiencies with Schlage's responses to their requests.[5]  Doc. 131 at ¶¶ 24-25.  On July 3, 2019, Movants served responses and objections to the Additional Requests.  Doc. 134 at ¶ 41.  On July 8, 2019, Schlage sent Movants a letter urging compliance with the Additional Requests.  Docs. 131 at ¶ 32; 131-18.  On July 23, 2019, the parties had a meet and confer by telephone, during which Movants' counsel Sondra Grigsby

---

[5] The letter specifically mentioned concerns regarding Schlage's response to Plaintiffs' First Set of Requests for Production of Documents ("Plaintiffs' First Set of Requests") Nos. 27, 28, 29 and Second Set of Requests Nos. 10, 16, 17, 25.  Doc. 131-12.  The letter also pointed out that the custodian list was insufficient.  *Id.*

emphasized Schlage's production deficiencies and Koshy agreed to withdraw some portion of the Additional Requests.  Doc. 131 at ¶¶ 34-35.  On August 2, 2019, Schlage served a discovery letter in which it agreed to produce more documents related to the Crain's article but refused to produce any additional documents unless Movants provided responsive documents to Schlage's Additional Requests.  *Id.* at ¶ 36; Doc. 131-19.  On August 12, 2019, Schlage produced four documents related to the Crain's article.  Doc. 131 at ¶ 37.  On August 30, 2019, Movants served a second deficiency letter.[6]  *Id.* at ¶ 38.  The parties had another meet and confer call on September 19, 2019 during which Koshy admitted that Schlage's counsel had not reviewed all of the documents Movant had produced and Grigsby explained that many of the Additional Requests were duplicative.  Docs. 131 at ¶ 45; 134 at ¶ 50.  Koshy agreed to respond to Movants' second deficiency letter by September 27, 2019 but did not do so.  Doc. 134 at ¶ 52.

On November 27, 2019, Plaintiffs and the Legacy Defendants filed a motion to compel Schlage to produce several categories of documents, and a motion for a protective order shielding them from several of Schlage's discovery demands.  Docs. 129; 132.  Schlage opposed.  Docs. 145-48.

## II.   Standards of Review

### A.  Motion to Compel

District courts have broad discretion in deciding motions to compel.  *See Grand Cent. P'ship. Inc. v. Cuomo*, 166 F.3d 473, 488 (2d Cir. 1999).  Under Federal Rule of Civil Procedure 26(b)(1), "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the

---

[6] The letter raised deficiencies with Schlage's response to Legacy Defendants' First Requests for Production of Documents ("Legacy Defendants' First Set of Requests") Nos. 6, 11, 13, 14, 17 and 18.  Doc. 131-20.

case . . ." Fed. R. Civ. P. 26(b)(1).  Although "[t]he discovery rules are to be given a

broad and liberal construction . . . they do not permit discovery of matters that are neither

relevant to issues in the case nor calculated to lead to relevant and admissible evidence."

*Estee Lauder, Inc. v. Fragrance Counter, Inc.*, 189 F.R.D. 269, 274 (S.D.N.Y. 1999).

The party seeking discovery must first demonstrate that the information is discoverable,

including, *inter alia*, that it is relevant.  *See, e.g.*, *Mandell v. The Maxon Co.*, No. 06 Civ.

460 (RWS), 2007 WL 3022552, at *1 (S.D.N.Y. Oct. 16, 2007) ("The party seeking

discovery bears the burden of initially showing relevance.") (citation omitted)); *see also*

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 102 (S.D.N.Y.

2013) ("The burden of demonstrating relevance is on the party seeking discovery.").

Once the moving party meets its burden, the objecting party must justify curtailing

discovery.  *Allison v. Clos-ette Too, LLC*, No. 14 Civ. 1618 (LAK) (JCF), 2015 WL

136102, at *8 (S.D.N.Y. Jan. 9, 2015).

### B.  Motion for Protective Order

Rule 26(c)(1) provides that the Court "may, for good cause, issue an order to

protect a party or person from annoyance, embarrassment, oppression, or undue burden

or expense."  Fed. R. Civ. P. 26(c)(1).  "This rule 'confers broad discretion on the trial

court to decide when a protective order is appropriate and what degree of protection is

required.'"  *U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, 593 F.

App'x 32, 36 (2d Cir. 2014) (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36

(1984)).  "Rule 26(c) allows for the crafting of appropriate relief, including that the

disclosure or discovery may be had only on specified terms and conditions."  *Ambac*

*Assurance Corp. v. Adelanto Pub. Util. Auth.*, No. 09 Civ. 5087 (JFK), 2012 WL

1589597, at *3 (S.D.N.Y. May 7, 2012) (citation omitted).

"The party seeking a protective order bears the burden of establishing that good cause for the order exists." *Id.* at *5 (citing *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 142 (2d Cir. 2004)). It must demonstrate a "particular need for protection," showing "specifically how, despite the broad and liberal construction afforded the federal discovery rules, each request is not relevant or how each question is overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." *Id.* (citations omitted).

## III.   Discussion

### A.   Motion to Compel

In their motion to compel, Movants argue that, despite the exchange of deficiency letters and occurrence of meet and confer conferences, Schlage has improperly refused to produce documents related to several of their document demands. Movants contend that Schlage's productions have been deficient by failing to search the email of three key custodians and failing to produce documents related to the misrepresentation, breach of contract and defamation claims. Schlage opposes, reasoning that the documents Movants seek have either been produced, are irrelevant, or their relevance is outweighed by the burden of producing them.

The Court first turns to three preliminary issues raised by Schlage in its opposition, and then addresses the substance of Movants' motion to compel.

### i.   Preliminary Issues

As an initial matter, Schlage agrees to perform additional searches for several categories of documents in response to Movants' motion to compel. Schlage assents to

review the 100 recipients of Bewley's email circulating the Marketing Bulletin that included the purportedly defamatory statement and, if those recipients are subject to Schlage's litigation hold, to search their emails to determine to whom they forwarded the Marketing Bulletin.[7]  Docs. 129 at 14-16; 130-1 at Plaintiff's First Set of Requests Nos. 27-28; 148 at 10 n.6.  Schlage additionally agrees to produce documents to support their damages claims for loss of profit, good will, opportunities, market share, reputation, and customers, despite having not met and conferred on all of these requests.  Docs. 130 at 23; 130-1 at Plaintiff's Second Set of Requests Nos. 32, 33, Legacy Defendants' First Set of Requests No. 40, Legacy Defendants' Second Set of Requests Nos. 10, 15- 20; 148 at 23.  Schlage further commits to searching the email of Timothy Eckersley, the Senior Vice President of Allegion and Vice President of the Americas region, and Maria Tamburri, Director of Public Affairs for Allegion.  Docs. 130 at 11-13; 148 at 6, 17 n.9, 24.  The Court approves Schlage's proposed resolution of these issues and directs Schlage to produce any additional documents pursuant to these requests and responsive to all requests in the possession of these additional custodians.

With respect to the remaining requests, Schlage urges that Movants have failed to comply with the rules of discovery because the parties have only met and conferred on a portion of the document requests in dispute.  Doc. 148 at 3 n.1.  The Court agrees.  To be sure, Grigsby submitted two deficiency letters and had two conversations to meet and confer with Koshy.  Doc. 130 at 7-9.  However, though Movants represent in their moving papers that they have "exhausted the meet and confer process[,]"  they do not counter Schlage's assertion that the parties only met and conferred on a portion of the

---

[7] Movants argue this solution "does not suffice" but provide no reason why the needs of the case merit production of every email forwarding the Marketing Bulletin.  Doc. 153 at 4.

requests they now seek to compel.  *See supra* nn.5, 6.  Absent a showing of exigency or that meeting and conferring would have been futile, conducting conferences on some disputed requests, but not all, before seeking judicial intervention on all disputed requests is not enough.  *Mason Tenders Dist. Council of Greater New York v. Phase Constr. Servs., Inc.*, 318 F.R.D. 28, 42 n.16 (S.D.N.Y. 2016) (noting that "courts have excused the meet-and-confer requirement where temporal exigencies required speedy action and where efforts at informal compromise would have been clearly futile.") (citation omitted).  Aside from circumscribed scenarios, judicial resolution of a discovery dispute makes sense "[o]nly if the parties truly reach an impasse on issues of such significance that requiring judicial intervention should applications to the Court be made, and only after they have exhausted their own discussions on the issues (and represented to the Court specifically that they have done so, including who was involved in the discussions, when they took place, and for how long)."  *Kaye v. New York City Health and Hosps. Corp.*, No. 18 Civ. 12137 (JPO) (JLC), 2020 WL 283702, at *1 (S.D.N.Y. Jan. 21, 2020) (denying, for example, to compel a privilege log where plaintiff provided no evidence that she had raised the need for one with defendants); *Vaigasi v. Solow Mgmt. Corp.*, No. 11 Civ. 5088 (RMB) (HBP), 2016 WL 616386, at *11 (S.D.N.Y. Feb. 16, 2016) ("Plaintiff's failure to meet and confer with defense counsel in good faith is sufficient reason by itself to deny plaintiff's motion to compel.").  Thus, the Court will address only those requests Schlage agrees that the parties discussed prior to Movants filing the motion to compel.  Those requests are:  Plaintiff's First Set of Requests for Production of Documents Nos. 27, 28 and 29, Plaintiff's Second Set of Requests for Production of

Documents Nos. 10, 16, 17, and 25, and Legacy Defendant's First Set of Requests for Production of Documents Nos. 6, 11, 13, 14, 17 and 18. Doc. 148 at 3 n.1.

Schlage further claims that Movants improperly rely on appendices in violation of Local Rule 37.1 and the Court's individual practices. Doc. 148 at 3-4. Local Civil Rule 37.1 requires a moving party to quote "each discovery request and response to which the motion or application is addressed" and to "set forth the grounds upon which the moving party is entitled to prevail as to each request or response."[8]  Under the Court's individual practices, litigants must adhere to a 25-page limit on memoranda in support of motions.[9] Schlage contends that the appendices expand the filing past the Court's page limitation, and that Movants do not provide sufficient reasoning for the deficiencies they claim. Doc. 148 at 3-4.  On this point, the Court disagrees.  Schlage points to no authority that an appendix quoting the request and response verbatim is inappropriate, and in fact offered their own appendix if the Court was inclined to consider Movants' appendix.[10] Doc. 148 at 3, 24-25.  The Court recognizes the difficulty of briefing several discovery disputes involving numerous requests, responses and objections, and finds the appendices submitted by Movants helpful; indeed the Court accepted Schlage's offer to submit its own responsive appendices and therefore declines to strike them.  *Id.* at 24; Docs. 155-57.

---

[8] Local Civil Rule 37.1, https://img.nyed.uscourts.gov/files/local_rules/localrules.pdf.

[9] Rule 2.B.i, https://nysd.uscourts.gov/sites/default/files/practice_documents/ER%20Ramos%20Individual %20Pracetices%20updated%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.pdf.

[10] The two authorities Schlage does cite involved clearly insufficient summaries of the requests at issue, not appendices of the requests recounted word-for-word. *Impact Envtl. Consulting v. Chillak*, No. 15 Civ. 6694 (AKT), 2016 WL 11185296, at *1-2 (E.D.N.Y. Sept. 8, 2016) (rejecting defendants' motion to compel for relying on "summarized . . . information" and "attach[ing] 'portions' of the disputed interrogatories" which required the Court to "flip flop between the body of the motion" to decide discovery disputes); *Sibley v. Choice Hotels Int'l*, No. 14 Civ. 634 (JS) (AYS), 2015 WL 9413101, *7 (E.D.N.Y. Dec. 22, 2015) (denying motion to compel further interrogatory answers where "Plaintiff simply provides a list of numbers of questions that are alleged not to have been answered").

### i.     Substantive Rulings

Movants argue that Schlage's responses to their discovery demands have been insufficient in several respects.  Each category is addressed in turn.

### a.     Insufficient Custodian Searches

As a general matter, Movants argue that Schlage has performed an insufficient search for relevant documents because Schlage failed to collect the email of key Allegion custodians Eckersley, Tamburri, and Kelley Buscetto.  Doc. 130 at 11-13.  While Schlage has now agreed to search the email of Eckersley and Tamburri, *see supra* Part III.A.i, Schlage continues to object to the search of Buscetto's email.  Doc. 148 at 6 n.4, 11 & n.7.  The Legacy Defendants requested all documents concerning her and Wexler or the Legacy Defendants, or with her concerning Wexler or the Legacy Defendants.  Doc. 130-1 at Legacy Defendants' First Set of Requests Nos. 10, 11.  Movants argue that Buscetto, as a Distributor Sales Consultant for Allegion, would have documents related to the distribution of the Marketing Bulletin, which she circulated to Jacob, and that she would be included on documents related to Wexler's alleged breach of his non-competition agreement.  Docs. 129 at 12; 131-1 at Ex. 13.  Schlage counters that searching Buscetto's email would be burdensome, but fails to explain why it would take any more effort than searching Eckersley or Tamburri's emails.  Docs. 148 at 10-11.  Despite Schlage's representations that Buscetto is not a material witness and was not subject to Schlage's litigation hold,  Doc. 148 at 11 & n.7, the Court finds that Buscetto's circulation of the Marketing Bulletin to Jacob suggests that her email contains documents relevant to these claims, and directs Schlage to search her email for responsive documents, and in particular documents responsive to Legacy Defendants' First Set of Requests Nos. 10 and

11.  *Capitol Records, Inc. v. MP3tunes, LLC*, 261 F.R.D. 44, 50-51 (S.D.N.Y. 2009)

(approving expansion of custodian list to lower-level employees because defendant had

"not shown that the production of all of the requested employees' email communications

would be unduly burdensome or that a search of their files would not potentially yield

relevant information.").

### b.      The Marketing Bulletin

Movants also argue that Schlage must produce documents responsive to

Plaintiffs' First Set of Requests Nos. 30, 31, and 32 which ask for all documents and

communications concerning the quality, distribution and manufacturing of Zero products.

Doc. 130 at 14-16.  Movants reason these requests are relevant to their defamation claims

based on the Marketing Bulletin.  *Id.*  Schlage agreed to produce documents and

communications regarding the quality of Zero products mentioned in the Marketing

Bulletin in response to Plaintiffs' First Set of Requests No. 29, which had been raised in

the parties' meet and confer conferences, but refused to produce the same concerning the

quality, distribution and manufacturing of Zero products more generally, which had not

been raised in their meetings.  Schlage explains that these requests are overbroad and

irrelevant.  Doc. 156 at Plaintiffs' First Set of Requests Nos. 30, 31, and 32.

The Court reaches these requests, despite having not been addressed in the parties

meetings prior to requesting judicial intervention because they are very closely related to

Plaintiffs' First Set of Requests No. 29, which all parties agree was raised.  Indeed,

Plaintiffs' First Set of Requests Nos. 29 and 30 are identical except that the former is

specifically targeted at the quality issues mentioned in the Marketing Bulletin and the

latter is meant to capture evidence of any quality issues with Zero products.  The

Marketing Bulletin stated that Schlage had "discovered several challenges and quality issues with the Zero product that needed to be corrected" and that "some of the products" were placed on "production hold."  Doc. 131-13 at WEXLER-0036099.  The quality issues with Zero products expressed in the Marketing Bulletin therefore went beyond the items listed in the document itself, and fairly stretch to a general allegation of quality issues across Zero products.  Therefore, Plaintiffs' First Set of Requests No. 30 requesting documents and communications regarding the quality of Zero products is a request that is tailored to the allegations, and likely to reveal relevant information; thus the Court directs Schlage to produce documents responsive to it.

The Court agrees with Schlage, however, that Plaintiffs' First Set of Requests Nos. 31 and 32, requesting documents related to the distribution and manufacturing of Zero products, would be overly broad and unduly burdensome and declines to compel production of documents responsive to those requests.

### c.    Deltrex

Movants claim to have requested all documents and communications concerning Schlage's interest in purchasing Zero and the APA to provide context for Schlage's claims that Wexler misrepresented that he played no role at Deltrex.  Docs. 130 at 17-18; 130-1 at Plaintiffs' First Set of Requests Nos. 3 and 5.  Schlage argues first that these requests were not raised during the parties' meet and confer discussions.  Doc. 148 at 13.  Schlage further asserts that it has already produced documents related to the APA and its interest in purchasing Zero as it related to Wexler's representations regarding his role at Deltrex.  *Id*. at 13-14; Doc. 156 at Legacy Defendants' First Set of Requests No. 17.  Finally, Schlage reasons that because these requests were propounded over nine months

prior to Schlage bringing its misrepresentation counterclaim, they were more likely related to Plaintiffs' fraudulent inducement claim which was previously dismissed by this Court.  Doc. 148 at 13; Doc. 87 at 14.  While the Court finds Schlage's arguments regarding these requests convincing, the Court also accepts Schlage's offer to conduct additional searches on the additional custodians Movants have identified, Eckersley, Tamburri and Buscetto, to find additional documents responsive to these requests and directs Schlage to do so.  Doc. 156 at Plaintiffs' First Set of Requests Nos. 3 and 5.

### d.     Wexler's Termination

Movants argue that while Schlage agreed to produce documents about Wexler's employment with Zero International, its production is incomplete because it does not include his entire employee file, documents regarding the manner of his termination, or communications from Schlage to customers, clients, industry professionals, industry experts or government entities about Wexler.  Docs. 130 at 18-20; 130-1 at Plaintiff's First Set of Requests Nos. 17, 25.[11]  For example, Schlage produced a final communications plan with a script for announcing Wexler's departure from Zero International, but no drafts.  Docs. 130 at 19; 131-26.  In the Legacy Action, Schlage also produced an email from Mehrotra to Wexler and others regarding Jacob's role alongside his father at Zero International, which Movants believe should have been produced pursuant to their requests.  Docs. 130 at 20; 131-21.  Schlage counters that the requested documents are not relevant, and searching for them would be burdensome given the size

---

[11]  The Court accepts Movants' representation that they tried to meet and confer with Schlage on these requests.  Doc. 130 at 20.  Notably, Schlage did not argue in its opposition papers to the contrary, and only raised an objection under Rule 37 in its appendix submitted eight months later.  Docs. 148 at 15-18; 156 at Plaintiff's First Set of Requests Nos. 17, 25.

of its staff.  Doc. 148 at 16-18.  Schlage further argues that emails about Jacob's expected role at Zero International are not responsive.  *Id.* at 17-18; Doc. 131-21.

Wexler's employee file is relevant to his claim of defamation.  So, too, are documents concerning the manner of his termination.  Defamation is defined as "'a false statement, published without privilege or authorization to a third party, constituting fault and it must either cause special harm or constitute defamation per se.'"  *Cojocaru v. City Univ. of New York*, No. 19 Civ. 5428 (AKH), 2020 WL 3791669, at *3 (S.D.N.Y. July 7, 2020) (citing *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 169 (2d Cir. 2003)).  In the Amended Complaint, Wexler alleges that he was fired by Schlage without having ever been warned of any performance deficiencies and that, following his termination, Schlage represented to others in the industry that he was let go for cause.  Doc. 52 at 93-95.  Contrary to Schlage's position, his performance during his employment, which presumably should be reflected in his employee file, is directly relevant to the veracity of any allegedly defamatory statements that Wexler was fired for cause.

Moreover, Movants allege that Schlage had told others that Wexler was escorted out of the building by security.  *Id.* at ¶ 94; 130 at 19.  This Court denied dismissal of Wexler's defamation claim in part because the Court "[could] not say as a matter of law whether a reasonable listener would have understood Defendants' statements to be conveying opinions or facts."  Doc. 46 at 12.  To the extent there is any document reflecting that circumstance, it is relevant and Movants are entitled to it.  Doc. 153 at 5.

The Court also agrees that the email produced in the Legacy Action regarding Wexler's training of Jacob is responsive.  Plaintiff's First Set of Requests No. 17 requests, in part, documents and communications concerning Wexler's role and

responsibilities at Zero International.  According to this email, his role and responsibilities including training Jacob.  Doc. 131-21.  Wexler's duties are relevant to evaluating whether he performed as an employee, which is directly relevant to his defamation claim.

Wexler, however, has pointed to no authority for why he would be entitled to drafts of Schlage's final communications plan regarding his termination from Zero International.  Plaintiff's First Set of Requests No. 25, which requests communications between Schlage, customers, and others in the industry concerning Wexler, is about Schlage's outward-facing communications concerning Wexler, not its internal discussions about the plan.  Moreover, Schlage represents that no such communications exist.  Doc. 148 at 16.

Schlage is also correct that Plaintiff's First Set of Requests No. 25 seems to have no limiting principle.  If read literally, it would require searching the email of every employee for external communications about Wexler.  Doc. 156 at Plaintiff's First Set of Requests No. 25.  The Court therefore declines to compel Schlage's response to this request, except to the extent that Schlage has offered to do so.

Accordingly, Schlage is directed to search Eckersley, Tamburri, and Buscetto's email for documents responsive to these requests and is directed to do so.  Docs. 148 at 16 n.8; 156 at Plaintiff's First Set of Requests Nos. 17, 25.

### e.      Breach of the Distribution Agreements

Movants argue that because of their claims regarding the distribution agreements, they are entitled to all documents and communications concerning Kazi Khozema, the General Manager of Zero East and Kentaro Muto, the President of Zero Asia.  Docs. 130

at 20-21; 130-1 at Plaintiff's First Set of Requests Nos. 45-46.  Schlage responds that

these requests, which were not raised by meet and confer prior to the filing of the instant

motion, are overbroad, unduly burdensome, and not proportional to the needs of the case.

Docs. 148 at 18-19; 156 at Plaintiff's First Set of Requests Nos. 45-46.  The Court agrees

with Schlage and will not compel response to these requests except to the extent Schlage

offers to search for responsive documents in the possession of Eckerlsey, Tamburri, and

Buscetto.  Doc. 156 at Plaintiff's First Set of Requests Nos. 45-46.

### f.    Non-Competition Agreement

Movants reason that Schlage's response to several requests concerning the non-

competition agreement are insufficient because they produced emails that Schlage should

also have produced as responsive to their requests.  Docs. 130 at 21-22; 156 at Plaintiff's

Second Set of Requests Nos. 25, Legacy Defendants' First Set of Requests Nos. 11, 18.

Schlage counters that the documents Movants cite have nothing to do with the non-

competition claims, as they provide updates on Zero International products to Jacob

while he was working at AAA Architectural Hardware.  Doc. 148 at 21-22.  The Court

agrees that these documents are irrelevant.

Movants further argue that Schlage must be compelled to produce documents

concerning Crocco or Mayflower Sales and Legacy or the Wexlers.  Doc. 130 at 22.

However, Movants cite no evidence to suggest that any such documents exist besides that

Schlage identified both in their initial disclosures.  *Id.*  But, as Schlage points out,

identifying Crocco and Mayflower Sales in their initial disclosures does not necessarily

mean that it would have documents related to either.  Doc. 148 at 22.  The Court accepts

Schlage's representation that it has searched for and found no responsive documents and

denies Movants' motion to compel response to these requests.  Doc. 156 at Legacy

Defendants' First Set of Requests Nos. 13, 25; *Mason Tenders*, 318 F.R.D. at 42

("Generally, a party's good faith averment that the items sought simply do not exist, or

are not in his possession, custody, or control, should resolve the issue of failure of

production since one cannot be required to produce the impossible.") (citations omitted).

### B.    Motion for Protective Order[12]

In their motion for a protective order, Movants argue that Schlage's Additional

Requests are duplicative, untimely, and unduly burdensome.  Movants additionally

contend that Schlage's requests related to nonparty companies like Legacy Rubber are

irrelevant, and that Schlage's other requests are overbroad, burdensome, and expensive.

In opposition, Schlage agreed to withdraw several of its Additional Requests, leaving

only those relating to Popov, McCartney, Legacy Rubber, information received from

Cameron, or that were critical to its claims.[13]  Schlage argues that good cause exists to

modify the discovery schedule to permit the remaining Additional Requests, that the

demands aimed at nonparty companies are relevant to its claims, that its requests are

narrowly-tailored and not burdensome.  The Court addresses each argument in turn.

### i.    Additional Requests

Though Movants are correct that the Additional Requests are untimely, good

cause exists to modify the Court's document discovery deadline to allow those relating to

Wexler's alleged aliases and new endeavor Legacy Rubber.  Under Rule 16(b)(4) of the

---

[12] For the same reasons noted *supra* Part III.A.i, the Court accepts the parties' appendices. However, unlike the requests at issue in the motion to compel, Movants have alleged that they have met and conferred on, expressing general objections to, all of the requests at issue.  Doc. 133 at 7-8.  The Court will therefore address all of the requests listed in the appendices, except for those Schlage has agreed to withdraw.  Docs. 145 at 15 n.6; 157 at Second Requests Nos. 71, 74, 75 and 78.

[13] Schlage withdrew Schlage's Third Set of Requests to Plaintiffs Nos. 13-15, 17-19, 21-23, 25-31, 33-44. Doc. 145 at 8 n.3.

Federal Rules of Civil Procedure, "[a] schedule may be modified only for good cause and with the judge's consent."  Good cause is demonstrated when "despite [the party] having exercised diligence, the applicable deadline could not have been reasonably met."  *Joye v. Psch, Inc.*, No. 14 Civ. 3809 (AT) (HBP), 2016 WL 3141659, at *5 (S.D.N.Y. June 3, 2016) (collecting cases, including *Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.*, 889 F. Supp. 2d 453, 457 (S.D.N.Y. 2012)).  Other factors the Court may consider include the party's explanation for not complying with the Court's scheduling order, diligence in requesting to modify the scheduling order, whether the party has had an adequate opportunity to seek discovery, prejudice to the opposing party, whether trial is imminent, and whether the discovery is likely to lead to relevant evidence.  *Rubik's Brand Ltd. v. Flambeau, Inc.*, 329 F.R.D. 55, 58 (S.D.N.Y. 2019); *In re Application of Barnet*, No. 13 Misc. 214 (RMB), 2014 WL 7409524, at *5 (S.D.N.Y. 2014).  Though Schlage became aware of the alleged Popov alias in late February 2019, it was not aware of McCartney or Legacy Rubber until after document discovery concluded that April. Schlage therefore could not have propounded demands related to McCartney or Legacy Rubber before the document discovery deadline elapsed.  With respect to Popov, Schlage explains that, because the Federal Rules require 30 days to comply with document requests and discovery was set to end in mid-April, it would have had to serve its demands within just two weeks of learning about Popov while in the middle of reviewing documents for its own productions.   Doc. 145 at 7-8 & n.2; Fed. R. Civ. P. 34(b)(2)(A). Allowing Schlage to propound these demands would not delay trial and, because these requests are narrow, they are not unduly burdensome or prejudicial to Plaintiffs.  Most importantly, these requests are likely to garner important evidence for Schlage's claims

that Wexler violated his non-competition agreement by working at Legacy and its subsidiary projects.[14]  Though Movants dispute that these names were Wexler's aliases,[15] if Wexler was using them to circumvent his non-competition agreement, it would be unfair to block Schlage from seeking documents related to them when Schlage only became aware of them relatively recently.

Therefore, Movants' motion for a protective order is denied with respect to Schlage's Third Set of Requests for Production of Documents to Plaintiffs ("Schlage's Third Set of Requests to Plaintiffs") Nos. 1-11 and Schlage's Second Set of Request for Production of Documents to Legacy Defendants ("Schlage's Second Set of Requests to Legacy Defendants") Nos. 1-21.[16]  Movants are directed to produce documents responsive to those demands.

No good cause exists, however, for the Additional Requests that are unrelated to the late-discovered alleged aliases.  Movants' motion for a protective order with respect to Schlage's Third Set of Requests for Production of Documents to Plaintiffs Nos. 16, 20, 24, 32, and 45 is thus granted.

---

[14] Movants argue that documents related to Legacy Rubber are irrelevant to Schlage's claims.  Doc.133 at 19.  But, that one of Wexler's purported aliases has a Legacy Rubber email account is enough to make this non-party relevant to Schlage's non-competition claims.  Doc. 145 at 12-13.

[15] Movants argue that both Popov and McCartney are real people.  Doc. 145 at 3-4.  Movants further urge that the Court cannot rely on Cameron's affidavit that Popov was Wexler's alias because it is based at least in part on hearsay.  *Id.*  However, the authority they cite, *Young v. U.S.*, No. 12 Civ. 2342 (ARR) (SG), 2014 WL 1153911, at *6 (E.D.N.Y. Mar. 20, 2014), merely holds that a court may not consider hearsay when considering a Rule 12(b)(1) motion and not a discovery motion.

[16] Movants assert that Schlage's requests for all documents and communications between Wexler or any entity he owns or has an interest in, and Legacy, relating to use of Wexler's Ohio property, and for all previous versions of Legacy's website could have been made prior to the discovery deadline.  Docs. 133 at 15.  However, both of these requests are aimed at the removal of Popov and addition of McCartney and Legacy Rubber to the Legacy website, which was only discovered by Schlage after document discovery had closed.  Doc. 145 at 7 n.1.  Movants additionally contend that collecting the entire email of Popov and McCartney is overbroad, but because they are alleged aliases, every email would show the extent of the alleged ruse.  Docs. 145 at 15-16; 151 at 7-8.

###### ii.    Requests Regarding Unrelated Parties

Movants generally argue that Schlage's requests for documents and communications related to companies Wexler has a direct or indirect ownership interest in, provides services for, or receives compensation for, are overly broad.  Doc. 133 at 16-17.  Movants also argue that they are irrelevant given that these companies are not parties to this action.  *Id.* at 17.  Schlage counters that evidence of Wexler's involvement in any competing activities through companies like WexUSA or Deltrex during the term of his non-competition agreement is relevant to their claims.  Doc. 145 at 11-15.  The Court agrees and therefore denies Movant's motion for a protective order with respect to Schlage's requests that are narrowly-tailored to garner such information.  Doc. 157 at Schlage's Second Set of Requests to Plaintiffs Nos. 64, 66, 73 and First Set of Requests to Legacy Defendants Nos. 10-13, 16.

###### iii.    Remaining Requests

Of the remaining requests, the Court denies Movants' motion for a protective order with respect to the following narrow categories:

- Wexler's financial status, *id.* at Schlage's First Set of Requests to Plaintiffs Nos. 55-58[17];

- Wexler and Jacob's development of competing products, *id.* at Schlage's Second Set of Requests to Plaintiffs No. 68; and

---

[17] Unlike in the cases cited by Movants denying requests for similar financial information, here Wexler's financial information is relevant to his damages claims and cannot be gathered from another source.  *Rosas v. Alice's Tea Cup, LLC*, 127 F. Supp. 3d 4, 11 (S.D.N.Y. 2015); *Mazzaro de Abreu v. Bank of Am. Corp.*, No. 06 Civ. 673 (LMM) (DFE), 2008 WL 4787553, at *3 (S.D.N.Y. Oct. 28, 2008).

- Legacy's financials, formation, employees, and competition with Zero, *id.* at First Set of Requests to Legacy Defendants Nos. 1, 16-17, 21-24, 26, 29, 31, 33, 39-40, 45-50, 56-57, 62, 68-70, 76-77.

Any additional discovery expenses Movants will incur complying with these requests would be proportional to the needs of this case, where Movants estimate their damages at over $45 million.  Doc. 145 at 23.

The Court grants Movants' motion for a protective order with regard to the remaining requests, which the Court finds overly broad. Doc. 157 at Schlage's Second Set of Requests to Plaintiffs Nos. 67, 69-70, 87, 116-18, Schlage's First Set of Requests to Legacy Defendants Nos. 4, 8, 19-20, 25, 27, 34, 36-37, 52, 54, 59-61, 63-67, 87-89, 92.

## IV.   Conclusion

In sum, Movants' motion to compel is granted with regard to the following additional searches and document demands:

- the recipients of Bewley's email attaching the Marketing Bulletin;

- the emails of Timothy Eckersley, Maria Tamburri, and Kelley Buscetto;

- Plaintiffs' First Set of Requests Nos. 17, 27-28, 30;

- Plaintiffs' Second Set of Requests Nos. 32-33;

- Legacy Defendants' First Set of Requests No. 40; and

- Legacy Defendants' Second Set of Requests Nos. 10, 15-20,

and is denied with regards to all other requests by Movants.  Movants' motion for protective order is denied with respect to the following requests by Schlage:

- Schlage's First Set of Requests to Plaintiffs Nos. 55-58;

- Schlage's Second Set of Requests to Plaintiffs Nos. 64, 66, 68, 73;

- Schlage's Third Set of Requests to Plaintiffs Nos. 1-11;

- Schlage's First Set of Requests to Legacy Defendants Nos. 1, 10-13, 16-17, 21-24, 26, 29, 31, 33, 39-40, 45-50, 56-57, 62, 68-70, 76-77; and

- Schlage's Second Set of Requests to Legacy Defendants Nos. 1-21,

and is granted with regards to all other requests by Schlage.

The parties are directed to produce responsive documents in accordance with this Opinion and Order to the requesting party by **September 25, 2020**.

The Court directs the Clerk of Court to file this Opinion and Order under seal with access restricted to the Court and the attorneys of record listed on ECF.  The Court additionally directs the parties to submit a copy of this Opinion and Order with proposed redactions on consent by **August 28, 2020** for posting on the public docket.  Chambers will email the parties with further instructions.

The Clerk of Court is respectfully directed to terminate the motions and requests for oral argument, Docs. 129, 132, 135, 136, and 158.


SO ORDERED.


Dated:    August 25, 2020
          New York, New York

_____
Edgardo Ramos, U.S.D.J.

28